Madden, Judge,
delivered the opinion of the court:
The House of Representatives had before it a bill proposing to pay the plaintiff $729,285.80 as its loss in the performance of certain subcontracts which it had with' the Submarine Signal Company, which company had prime contracts with the Department of the Navy. The House of Representatives referred the bill to this court pursuant to sections 1492 and 2509 of Title 28 of the United States Code.
The plaintiff, long experienced in the manufacture of precision equipment, began in 1941 to receive subcontracts from prime contractors with the armed services for the design, development, and manufacture of various components of radar equipment. The plaintiff designed and built the first “nutating” type of radar antenna produced in the United States.
Submarine Signal Company, in 1945, made two research and development contracts with the Navy for the design and manufacture of two types of radar equipment. In 1944 another contract between the parties called for the manufacture of 189 sets of elliptical scan antennae for radar equipment at a fixed price per unit. In 1945, when Submarine Signal was working on its research and development contracts, the *487 Japanese suicide or “Kamikaze” attacks on our ships were becoming more effective, and a fire control radar unit was needed which would locate and track an approaching plane and direct gunfire at it. The Navy was seeking a nutating radar antenna which would provide a broad elliptical search pattern but could be rapidly shifted, without losing the target, to a more accurate conical pattern for directing the gunfire at the target plane.
Because of the plaintiff’s known experience in the design and development of radar equipment, it was approached with' reference to the solution of the problem. A meeting of representatives of Submarine Signal, the Navy, the Applied Physics Laboratory of Johns Hopkins University and the plaintiff was had, and the plaintiff agreed to design, develop and build preproduction units of a nutating antenna that would meet the Navy’s requirements as set forth in its contracts with Submarine Signal. In due course Submarine Signal made subcontracts with the plaintiff at fixed maximum prices for engineering services, for sets of drawings, and for 15 preproduction models. On August 31, 1945, Submarine Signal made a production subcontract with the plaintiff for the manufacture of 232 nutating antenna units at a fixed maximum price per unit, and for production tools and spare parts at fixed total prices.
This production subcontract was made before the plaintiff’s design of the nutating antenna had been completed. The plaintiff seemed to experience no abnormal difficulty in completing the design and in manufacturing the first pre-production model. The model was given a 24-hour test in the plaintiff’s plant and operated satisfactorily. It was then shipped to Submarine Signal, which was required to subject it to the Navy life test, which consisted of seven days of continuous operation followed by intermittent operation for fourteen days under varying temperature, humidity, and environmental conditions.
The model failed the Navy test. After it had been operated for several hours, it began to slow down and finally stopped. Nine other preproduction models failed the test. The shifter mechanism and moving parts showed pitting on *488 some of the metal components, and the formation of a gummy, rust-colored residue between the moving parts.
The plaintiff, by experimentation and by seeking advice from many sources, sought to solve the problem, but without success until, late in 1946, it consulted Dr. Chamberlain, an eminent nuclear physicist at Michigan State University. Pie diagnosed the trouble as due to molecular evaporation, the reflection of forces back and forth through the mechanism at the speed of light, a speed so great as to overcome the magnetic forces which hold the molecules of the metals together, and cause a blasting off of molecules from their surfaces. These blasted-off molecules oxidized and mixed with the lubricant, forming the gummy substance which prevented the mechanism from operating.
The disease having been diagnosed, Mr. Kelly, one of the plaintiff’s engineers, developed the cure. A redesigned model passed the Navy life test in March 1947. Production began in May 1947 and was completed in 1948. The problem and its solution had, however, put the plaintiff to great and unanticipated expense which it did not recoup from its receipts for the production of the units. It had no valid claim against Submarine Signal, since it had agreed to do the development work and manufacture the units at fixed prices. It had no claim against the Navy, since it had no contract at all with it. Submarine Signal and the Navy recognized the plaintiff’s misfortune, and the Navy paid Submarine Signal $109,733.80 in addition to the prime contract price, which sum was paid over by Submarine Signal to the plaintiff, as the Navy intended. Submarine Signal also paid the plaintiff $40,000 in settlement of all claims. Those payments still left the plaintiff with a loss of $527,703.79 on the three subcontracts.
It is apparent from the above that the plaintiff has no legal or equitable claim against the United’ States, in the sense of a claim enforceable in a court, under applicable legal standards. The plaintiff urges that there is a moral obligation upon the United States to compensate it for its losses. It says, and we have found as facts, that the difficulty which gave rise to its losses was not anticipated by itself or the prime contractor or the Navy; that its attempts to solve the *489 difficulty were reasonable and appropriate. These facts, standing alone, would not give rise to a moral right to shift its losses to some one else. When one makes a contract to perform certain work for a fixed price, he takes the chance that unanticipated difficulties may increase the cost of performance and make the contract a losing one for him. In the instant case the plaintiff seeks to shift the loss to the Government with whom it had no contractual relation at all, and that is indeed hard to justify.
In 1946 Congress enacted the Lucas Act, 60 Stat. 902, as amended, 62 Stat. 992, 41 U. S. C. § 106 note (1946 Ed., Supp. V), providing for the payment to World War II contractors and subcontractors of the amount of their losses on war contracts, if they had requested relief under the First War Powers Act. During the war the principal contracting agencies of the Government had been given the power, under the First War Powers Act, to increase, without consideration, contract prices, if to do so would further the prosecution of the war. After the war, Congress seems to have thought it fair that contractors who had not had their prices increased, or not increased enough to prevent losses on their contracts, should receive additional pay in the amount of their losses. But the statute provided that losses, in order to be recoverable, must be overall losses remaining after taking into consideration all of the claimant’s Government war contracts and subcontracts.
The Lucas Act was not applicable to the plaintiff’s contract which was performed in peace time. If Congress chooses to apply to the plaintiff the same standard of moral obligation which it extended to World War II contractors, it would perhaps desire to place a limitation comparable to that contained in the Lucas Act, i. e., that the compensable loss should be an overall loss on all of the claimant’s Government contracts or subcontracts during the period of performance of the contract on which the claimed loss was incurred. If so, our findings 31 to 34 show that the plaintiff’s overall loss was $132,886.61.
The plaintiff urges that out of the difficulties which caused its losses emerged a discovery which was of great benefit to the Government. We think that is true. It encountered a *490 baffling problem, found insoluble by numerous experts, the ultimate solution of which might well have been long delayed if the plaintiff had not been under contractual obligation to get it solved. It was good for the country’s military power and its defense to have it solved. Congress might reasonably want to share with the plaintiff the expense of getting the problem solved.
This opinion, together with the findings of fact, will be certified to the Congress pursuant to House Resolution 547, 83d Congress, 2d Session.
Laramore, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
EINDINGS OF PACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiff’s petition was filed pursuant to House Resolution 547, 83rd Congress, Second Session, which was adopted on June 8,1954, and provides as follows:
Besolmed, That the bill (H. R. 2042) entitled “A bill for the relief of the Palmer-Bee Company”, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
H. R. 2042 reads in part as follows:
Be it enacted by the Senate amd House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Palmer-Bee Company, of Detroit, Michigan, the sum of $729,285.80. Such sum represents the actual loss incurred by the said *491 Palmer-Bee Company in tbe performance of subcontracts, dated June 25, 1945, and August 31, 1945, for the design, development, and production of a quantity of nutating radar antennae, by and between the said Palmer-Bee Company' and the Submarine Signal Company, of Waltham, Massachusetts, prime contractor with the Navy Department, under a cost-plus-fixed-fee contract (NOrd 9598) and a fixed-price contract (NOrd 7250).
2. Plaintiff is a Michigan corporation whose principal offices are at Bloomfield Hills, Michigan, and whose plant is located at Marysville, Michigan.
3. Plaintiff was founded in 1905, and since that time has been engaged in the design, development, and production of progressive assembly systems, gear trains, mechanical power transmission devices, and speed reducers. As a result of its experience in the design, development, and manufacture of speed reducer gear equipment, plaintiff in 1941 received subcontracts for the design, development, and production of various components of radar equipment from prime contractors with the Army Signal Corps, the Navy, and the Air Force.
During the war, plaintiff, as a subcontractor with the General Electric Company, designed and built the first nuta-ting type of radar antenna produced in the United States. It was to be used on radar equipment by the Signal Corps. In addition to the three subcontracts respecting the nutating antenna involved in this action, plaintiff had a subcontract with the Western Electric Company in 1945, under which plaintiff built nutating antenna for use with fire control radar on capital ships. Under a subcontract with the Radio Corporation of America, plaintiff also designed and developed a type of nutating antenna for use on radar equipment by the Air Force.
4. Under date of January 1, 1945, the Navy Department and Submarine Signal Company, a corporation having its principal office in Boston, Massachusetts, entered into a cost-plus-a-fixed-fee contract, under which the contractor was to perform certain research and development work relating to radar equipment. This contract, designated as NOrd-7923, was to expire on December 31,1945, but on August 28,1945, *492 it was supplanted by a cost-plus-a-fixed-fee contract designated as NOrd-9598, which, obligated the contractor to design and manufacture two pieces of radar equipment, supply certain parts, and furnish drawings as required. These two contracts were referred to as research and development contracts.
On October 16, 1944, the Navy Department and the Submarine Signal Company entered into Contract NOrd-7250, whereby the contractor agreed to manufacture and deliver to the Navy certain fire control radar units and associated spare parts. By Change Order 4, dated March 6, 1946, the contractor agreed to manufacture and deliver to the Navy 189 sets of elliptical scan antennae for radar equipment at a unit price of $4,103. As will hereinafter appear, the manufacture of the elliptical scan antennae was subcontracted by Submarine Signal Company to plaintiff. Contract NOrd-7250, the production contract, was a maximum price contract in which the stated unit prices were subject to revision downward.
5. Under the three Navy prime contracts described above, the Submarine Signal Company issued three purchase orders to plaintiff, being Purchase Orders Nos. X93663, X93664, and E65737. In its petition, plaintiff seeks recovery in the sum of $677,500.19 for losses sustained in the performance of the three subcontracts or purchase orders during the years 1946,1947, and 1948.
6. In the spring of 1945, Submarine Signal Company, in conjunction with and under the supervision of the Applied Physics Laboratory of Johns Hopkins University, was performing certain research and development work under Navy Contract NOrd-7923 (subsequently NOrd-9598), directed toward the development of fire control radar. At that time, there was an increase in the effectiveness of Japanese suicide or “Kamikaze” attacks on United States Navy vessels, and the Navy was in urgent need of a fire control radar unit which would locate and track a specific target in a minimum amount of time and which would be sufficiently accurate to direct destructive gunfire to the target. To do this effectively, the Navy had been seeking a nutating radar antenna to be used with the Radar Equipment Mark 39, Model 3, *493 which would not only provide a broad elliptical search pattern, but which also could be quickly shifted without losing the target to a more accurate conical pattern suitable for directing gunfire. The equipment had to be accurate in its performance, because the safety of the vessel and its several thousand men depended upon it. Spare parts had to be exact duplicates to permit quick replacement. The equipment had to be capable of operating efficiently for long periods of time, and of withstanding severe vibration, heavy shock, and wide variations of temperature and weather.
7. Because of plaintiff’s experience in the design and development of radar equipment, a representative of the Applied Physics Laboratory of Johns Hopkins University, Silver Spring, Maryland, called on plaintiff in April 1945 and discussed the possibility of plaintiff’s designing and developing a nutating antenna for use with fire control radar on capital ships. Later, in May 1945, a conference was held at the laboratory in Silver Spring, Maryland', which was attended by representatives of plaintiff, officers of the Submarine Signal Company, personnel of the laboratory, and two representatives of the Navy, including the project engineer who had been assigned to the three prime contracts entered into between the Navy and Submarine Signal Company. Two other companies had succeeded in developing antennae which would provide the elliptical and conical radar patterns, and these were inspected by plaintiff’s representatives at the meeting. However, the companies which designed these early models had failed to produce an antenna unit which could quickly shift from one pattern to the other without losing the target. During the course of the meeting, plaintiff agreed that it would undertake to design, develop, and build preproduction units of a nutating antenna that would meet the Navy’s requirements as set forth in its contracts Avith Submarine Signal Company. At that time, plaintiff was asked to quote prices to Submarine Signal Company for the cost of the design work, the cost of tooling, and the cost of the preproduction units.
8. On June 25, 1945, Submarine Signal Company issued two purchase orders to plaintiff. No. X93663, the first order, provided that plaintiff should be paid a maximum of $35,000 *494 for its engineering services and for two sets of reproducible drawings covering the design of the antenna. The second, No. X93664, specified that plaintiff was to furnish 15 pre-production models of the nutating antenna at a maximum price of $5,000 each, and 15 sets of spare parts at prices to be determined when plaintiff was furnished a detailed list. The order stated that one model was to be delivered by August 1,1945, and that the remaining 14 models were to be delivered between August 1, and September 15, 1945.
9. On or about June 19,1945, Submarine Signal Company furnished plaintiff with proposed specifications for the antenna. These specifications, which had been prepared by the Navy, described the antenna in terms of performance characteristics, leaving the selection of materials and the means for achieving the characteristics to the designer. However, the Navy had certain general specifications which prohibited the use of dissimilar metals in such proximity with one another that corrosion would occur. The antenna also had to conform to Navy requirements as to form and size in order that the devices might be readily installed in the limited space available for that purpose on Navy ships.
10. Immediately after the receipt of the purchase orders, plaintiff commenced the engineering design work and prepared a “bread-board model” of the device which was shown to a representative of Submarine Signal Company and to the Navy’s project engineer in order to demonstrate the principle involved and to indicate how the device would function. On July 11 and again on July 27,1945, the prime contractor wrote plaintiff, concurring in the principles involved in the design as developed by plaintiff by that time.
11. On August 81, 1945, Submarine Signal Company issued to plaintiff Purchase Order No. E65737 under Submarine Signal Company’s prime production contract numbered NOrd-7250. This order specified that plaintiff was to produce and deliver 232 nutating antenna units at a maximum unit price of $1,641, subject to revision downward; production tools necessary for manufacturing units at a price of $75,000 and spare parts at a maximum price of $516,928. On December 12,1945, the order was amended so as to reduce the *495 total number of units to 189 and to effect a corresponding reduction in the number of spare parts.
12. At the time the purchase order of August 81,1945, was issued, plaintiff’s design of the nutating antenna had not been completed, and no preproduction models had been made. However, in view of its past experience, plaintiff anticipated no unusual production problems and was willing to sign the purchase order. The principle involved in the design was fixed and had been concurred in by all concerned with the project. It was represented to plaintiff that, although the war had ended, the Navy’s need for the units was as urgent as it had been during the war period. The units were essential components of fire control radar equipment, which the Navy was installing on combat vessels.
13. While proceeding with the design and development of the first preproduction model, plaintiff encountered some difficulties in the use of materials, but these were considered normal problems. The first model was completed on December 25, 1945, and functioned satisfactorily during a 24-hour test operation in plaintiff’s plant. It was then shipped to the Submarine Signal Company, where the prime contractor was required to subject it to the Navy life test. This was a 21-day test consisting of a continuous operation for 7 days followed by an intermittent operation for 14 days under varying temperature, humidity, and environmental conditions.
14. Plaintiff’s first preproduction model failed to pass the Navy test. After the unit had been run for several hours, it began to slow down and progressively deteriorated until the entire unit stopped. Nine other preproduction models also failed to pass the test, since they either deteriorated or stopped operating after being run for periods of from 8 to 100 hours. A disassembly of the shifter mechanism and the moving parts of the first model showed pitting on the surface of some of the metal components and the formation of a gummy, rust-colored residue between the moving parts. In discussions between plaintiff’s engineers and those of the Submarine Signal Company, it was concluded that the problem was one of lubrication. Plaintiff called upon representatives of a number of the major oil companies to provide a *496 better lubricant, and the Navy project engineer supplied a special instrument grease with an alcohol base. In all, more than 100 different lubricants were used, but the rust-colored substance continued to form between the moving parts and caused the device to stop.
Plaintiff then began a series of experiments in an effort to eliminate the difficulty. The work was carried on under the supervision of a Mr. Kysor, one of its engineers. It was considered that the difficulty might be due to a number of causes, including foreign matter in the mechanism, electrolytic reaction between dissimilar metals, and the existence of an electro-magnetic field within the unit itself. Plaintiff eliminated the possibility that the trouble was caused by foreign matter in the mechanism by hermetically sealing the unit and excluding all oxygen or moisture from it. Through the use of services supplied by the laboratory of the Detroit Edison Company, plaintiff determined that the failure of the unit to operate properly was not caused by the existence of an electro-magnetic field within the unit. By the use of special parts in which all the metals used were the same, plaintiff demonstrated that the difficulty was not caused by electrolytic action between dissimilar metals.
During the course of its investigations, plaintiff called upon and received advice from engineers and experts from various organizations, including the United Shoe Machinery Co., the Nitralloy Corporation, X-Ray, Inc., and Submarine Signal Company. Plaintiff also engaged the services of an eminent metallurgist.
After the various efforts described above had failed, it was thought that the rusty residue was formed by a chemical reaction occurring between a material known as Gray Parco Lubrite, with which many of the parts were coated, and the lubricant used. To eliminate this possibility, plaintiff removed the Lubrite by grinding. Each of the parts was then coated with hard chrome and was reground to the original dimensions. A model constructed in this manner passed the Navy life test. However, a review of the cost of the labor and material used showed that the cost of manufacturing the antennae in that manner would be prohibitive.
*497 15. Late in 1946, plaintiff consulted Dr. Chamberlain, an eminent nuclear physicist at Michigan State University. After, examining the unit and reviewing the facts regarding its operation, Dr. Chamberlain stated that the difficulty was due to molecular evaporation, a phenomenon caused by shock energy. He explained that forces of varying magnitudes and moving from varying directions were exerted on the shifter mechanism when the unit operated and that these forces were reflected back and forth internally in the mechanism at the speed of light — a speed sufficient to overcome the magnetic forces which held the materials together. As a result, molecules were blasted from the surfaces of the material, and when the molecules oxidized and were mixed with the lubricant, a glue-like substance was created, and this caused the unit to stop.
Dr. Chamberlain had patented a shock absorber which had been successful in preventing molecular evaporation on other devices, but there was no space on plaintiff’s unit for mounting or attaching the patented shock absorber. In order to use the shock absorber, it would have been necessary for plaintiff to completely redesign the unit and to scrap the substantial inventory it had built up for performance of the purchase order of August 31,1945.
16. In January 1947, plaintiff assigned the solution of the problem to Mr. Kelly, one of its engineers who had been working on another project. He was instructed to discard the approaches that had been used in the past and to attack the problem on the basis of the scientific theories and explanations advanced by Dr. Chamberlain. About the end of February 1947, Mr. Kelly proffered a solution which involved changing some of the parts of the shifter mechanism and the addition of one new part. His solution resolved the offending forces so that they added up to zero. He also used centrifugal forces to hold the shifter mechanism in place and to prevent rocking or relative motion between the shifting mechanism and other parts in the device. This solution enabled plaintiff to avoid the excessive expense that would have been incurred by manufacturing antennae with the chrome-plated parts and also required reworking of only a small portion of the inventory on hand.
*498 A unit, involving the changes made by Mr. Kelly, was shipped to the Submarine Signal Company in March 1947 and successfully passed the Navy life test. Thereafter, in May 1947 plaintiff began producing and shipping the units and completed performance of the contract, plus spare parts, in 1948. As already stated, the purchase order had been revised to reduce the number of units from 232 to 189 plus spare parts. The contract price of the units to Submarine Signal Company was $1,641 per unit, and after the manufacture of the units utilizing the improvements developed by Mr. Kelly began, plaintiff was able to produce the antennae at a cost within the limits of the estimate it prepared at the time it agreed to deliver the devices at the price specified in the purchase order.
17. Throughout the period when plaintiff was engaged in designing and producing a preproduction model of the antenna, the Navy was kept informed of the difficulties encountered by plaintiff and of the various methods which it utilized in an attempt to solve the problem. The Navy project engineer made periodic visits to plaintiff’s plant in company with representatives of the prime contractor and observed the several attempts plaintiff made to construct a model that could meet the requirements. In addition, a Navy engineer, who was the head of a section in the Bureau of Ordnance that was in technical charge of contracts and programs relating to gunfire radar equipment, visited plaintiff’s plant at least on one occasion, and the Bureau of Ordnance was advised from time to time of the work being done in plaintiff’s plant on the antenna. Since the Navy’s contractual relationship was with the prime contractor only, the Navy representatives did not undertake to direct or instruct plaintiff as to any action that should be taken by plaintiff, nor did the Navy engineers object to any of the experiments or methods which plaintiff used in its efforts to produce a satisfactory antenna. The Navy representatives never met with any representatives of the plaintiff, except when someone from the Submarine Signal Company was present.
18. Although plaintiff underestimated the complexities and the costs of producing the antennae called for in the subcontracts with the Submarine Signal Company, the difficul *499 ties which plaintiff encountered in producing a device that would pass the Navy life test were of such an unusual nature that neither plaintiff, Submarine Signal Company, nor the Navy engineers foresaw them. The greater weight of the evidence establishes that these difficulties could not reasonably have been foreseen at the time the project was initiated.
19. There is no evidence that any representative of Submarine Signal Company or of the Navy reported any inefficiency on plaintiff’s part during the time it was experimenting with the nutating antenna in attempting to find a solution to the difficulty encountered. A number of conferences were held between representatives of the plaintiff, the prime contractor, and Navy officials. If the technical representatives of the Navy who visited plaintiff’s plant during the time it was working on the model had been of the opinion that plaintiff was negligent or inefficient in the efforts it mads to produce a satisfactory antenna, it would have been the duty of such Navy representatives to report such negligence or inefficiency to their superiors in the Bureau of Ordnance. No such report was made.
20. There is some evidence that plaintiff was at fault in failing to make a dynamic analysis of the problem presented when the first model failed to pass the test and before plaintiff began the various experiments to eliminate the difficulty. However, the greater weight of the evidence shows that in view of the circumstances and the unusual nature of the difficulty, plaintiff did all that reasonably could have been expected of it. The undisputed evidence shows that it was the opinion of the cognizant technical personnel of the Navy that plaintiff did everything that could have been expected of it in arriving at a solution of the problems it encountered in producing an antenna that would meet Navy requirements.
21. In its efforts to solve the unusual problems which arose in the course of designing and developing the antenna unit, plaintiff incurred costs which far exceeded the costs it had estimated when the project was initiated. These additional costs were due to several causes, including the amount spent directly on the various experiments and attempted solutions, costs due to stopping and starting production, and expenses incurred by plaintiff’s subcontractors and suppliers who *500 were forced by plaintiff’s orders to stop work and tben start again at various times. Some of plaintiff’s suppliers went out of business, and plaintiff bad to look elsewhere for various components wbicb it did not manufacture. In addition, there was a strike at plaintiff’s plant from January 1946 to April in the same year.
22. On March 5, 1947, representatives of plaintiff and of the Submarine Signal Company attended a conference in Washington, D. C., at the Bureau of Naval Ordnance. The chief of the contract division of the Bureau presided at the meeting. The purpose of the conference was to discuss the possibility of financial relief to compensate plaintiff for the losses it had sustained in producing the nutating antenna under its subcontracts with Submarine Signal Company. The meeting was initiated by a Navy engineer who was the head of a section that was in technical charge of contracts relating to gunfire radar equipment. He had been impressed by the desire of plaintiff to complete its contracts with Submarine Signal Company under extraordinary difficulties, believed that plaintiff had exerted every possible effort to produce the urgently needed equipment, and felt that consideration should be given to any legal remedies that might be available to compensate plaintiff for its losses. Although plaintiff had informally advised Submarine Signal Company of its losses and although the prime contractor was aware of the fact that plaintiff had sustained substantial losses, plaintiff had not presented any cost figures to the prime contractor, nor had plaintiff made any formal application for an increase in the contract price prior to the time the meeting was held. Plaintiff was advised that any relief it received would have to be obtained from the prime contractor, since the Navy had no contract with plaintiff. The representatives of the prime contractor stated that it had also experienced a subsantial loss in the performance of the production contract (NOrd-7250); that the extent of its liability to plaintiff was to pay plaintiff the contract price for the antennae, and that it could not pay plaintiff any excess costs, except to the extent that financial assistance was obtained from the Navy. The chairman of the meeting expressed the opinion that the production contract between the *501 Navy and Submarine Signal Company should, under the circumstances, have been let on a cost-plus-a-fixed-fee basis, but that in view of the terms of the prime contract there appeared to be no legal basis on which the Navy Department could authorize an increase in the contract price. He also said, “from the point of view of equity, there is a lot involved.”
At the conclusion of the meeting, it was agreed that plaintiff would supply detailed information on the extent of its losses to the Submarine Signal Company, and that the prime contractor in turn would prepare and send to the Navy a statement setting forth its position and the position of plaintiff regarding the losses occurring under the contract. It was further agreed that when the Navy received the information, further consideration would be given to the matter.
23. On June 25, 1947, a second conference was held in the Bureau of Ordnance. The primary purpose of this meeting was to discuss a request made by Submarine Signal Company in plaintiff’s behalf for a price increase on Contract NOrd-7250. The Navy officer in charge of the meeting stated that, since the contract was a fixed-price contract, with no escalator clause or other price adjustment clauses other than clauses which would permit a revision downward of the price, there was no legal means by which the Navy Department could increase the contract price. A suggestion was made that a request for the relief of plaintiff might be submitted as a hardship claim under the terms of the then pending Lucas Bill, but plaintiff was advised that any such claim would have to be made by the prime contractor.
24. During the conferences, plaintiff’s officers acknowledged that hindsight had demonstrated that plaintiff’s subcontracts with Submarine Signal Company should have been cost-plus-fixed-fee contracts, the same basis on which Submarine Signal Company entered into the two research and development contracts with the Navy. However, plaintiff’s president pointed out that the difficulties and complexities of the job could not be anticipated when plaintiff signed the purchase orders.
*502 25. At the first of the two conferences above described, one of plaintiff’s representatives stated that the company would become insolvent if it were forced to fulfill its contract with Submarine Signal Company and said that unless plaintiff received financial relief, it could not perform the contract. Prior to the second conference, plaintiff had written Submarine Signal Company that it had stopped operations on the production purchase order of August 31,1945. However, at the meeting of June 25,1947, plaintiff gave notice it was no longer standing on that letter. At the same time, one of plaintiff’s officers said that plaintiff did not then have sufficient cost data to determine whether the cost of completing the production contract would force the company into insolvency.
On December 9 and 10, 1947, plaintiff’s representatives conferred with Submarine Signal Company, and at that time plaintiff agreed to resume shipping antennae under the contract. There were furtlier discussions between plaintiff and Submarine Signal Company as a result of which it was agreed on April 8, 1948, that all claims which plaintiff asserted against Submarine Signal Company would be disposed of in the following manner:
(1) Submarine Signal Company would submit to the Navy Department a request for a change order which would involve an additional payment on Contract NOrd-7250 as a result of changes which the Navy Department had made in the specifications affecting the spare parts, and any money received by Submarine Signal Company was to be passed on to plaintiff; and
(2) plaintiff would submit a claim to the Submarine Signal Company for that portion of the losses which plaintiff suffered during the design and development stages of the antenna as a result of the adoption of certain procedures and the use of certain materials that had been insisted upon by Submarine Signal Company.
Plaintiff submitted a claim of $96,315 for the excess costs which it claimed to have incurred in category (2) above, and on May 14, 1948, Submarine Signal Company agreed to pay plaintiff $40,000 in full settlement of all plaintiff’s claims arising out of the three purchase orders issued to *503 plaintiff. Plaintiff accepted the offer, was paid the $40,000, and on September 1, 1948, plaintiff executed an instrument by which it released Submarine Signal Company from all claims arising out of the three purchase orders, with the exception of any money which Submarine Signal Company might receive from the Navy Department as an increase in the price of Contract NOrd-7250 on account of Navy changes in the specifications for the spare parts.
26. On August 2, 1948, Amendment No. 16 to Contract NOrd-7250 was issued by the Navy Department and accepted by Submarine Signal Company. Under this amendment, $109,733.80 was paid to Submarine Signal Company as an equitable adjustment in the contract price which was paid to reimburse the prime contractor for additional costs that resulted from specification and design changes approved by the Bureau of Ordnance with respect to the spare parts.
On September 8, 1948, Submarine Signal Company paid to plaintiff the $109,733.80 received from the Navy Department. The payment was passed on to plaintiff by Submarine Signal Company on the condition that if it were required to repay the money as a result of a post-audit review of the transaction by the General Accounting Office, plaintiff would refund the sum to the United States.
27. In arriving at the amount of losses claimed in this action, plaintiff has deducted the $109,733.80 and the $40,000 which it received from Submarine Signal Company.
28. Except for defendant’s obligation to grant to Submarine Signal Company non-exclusive, royalty-free licenses under patent applications on inventions made under or arising out of the research and development contracts, defendant has been duly released by said Submarine Signal Company and its successors or assigns of and from all liabilities, obligations and claims whatsoever in law and in equity under or arising out of said prime research and development contracts numbered NOrd-9598 (per release dated and executed May 8, 1950), and NOrd-7923 (per release dated and executed November 30,1949).
29. The prime production contract, NOrd-7250, between plaintiff’s prime contractor, Submarine Signal Company and *504 defendant, was duly terminated pursuant to the Contract Settlement Act of 1944.
30. While discussions between plaintiff and the Submarine Signal Company were in progress, renegotiation proceedings respecting plaintiff’s 1945 renegotiable business had been commenced in the War Contracts Price Adjustment Board under the Renegotiation Act of 1942. These proceedings involved not only plaintiff’s contracts with the Submarine Signal Company but other contracts with war agencies or subcontracts with prime contractors of such agencies. In such proceedings, plaintiff sought to have the losses it had sustained under the three purchase orders with Submarine Signal Company during the years 1945,1946,1947, and 1948, considered in the redetermination of its profits for the fiscal year 1945. The 1945 loss under the three purchase orders was taken into account, and the Board gave some consideration to the abnormal risk involved in plaintiff’s continuing in the manufacture of radar equipment after V-J Day, but the Board did not allow any dollar credit for losses on war production incurred after December 31, 1945.
Plaintiff sought a redetermination in the Tax Court of the Board’s findings of excessive profits. In the Tax Court, where the proceedings were de novo, the matter was resolved by stipulation which produced a result that was different in several respects from the decision of the Board. In arriving at the stipulated amount of plaintiff’s excessive profits for the year 1945 in the Tax Court, a loss of $78,617.90 sustained by plaintiff during 1945 from its three subcontracts with the Submarine Signal Company was considered by the parties, but no dollar credit was allowed to plaintiff for the losses it sustained in 1946, 1947, and 1948 on the three purchase orders. Plaintiff’s loss in 1945 under the three purchase orders is not included in its petition in this action.
31. Plaintiff’s sales for the years 1946,1947, and 1948 under the three subcontracts (purchase orders) entered into during 1945 with Submarine Signal Company totaled $1,340,339.29, on which plaintiff sustained a loss of $527,703.79.
32. Plaintiff’s total sales during 1946, 1947, and 1948 on all subcontracts involving radar antennae or equipment and entered into prior to December 31, 1945, by plaintiff with *505 Navy prime contractors amounted to $1,922,349.08, on which plaintiff suffered a net loss of $467,654.98.
33. On subcontracts involving radar antennae or equipment and which were entered into by plaintiff with various Navy prime contractors after December 31, 1945, plaintiff’s total sales during the years 1946, 1947, and 1948 amounted to $2,566,582.68 and its net profit thereon amounted to $334,768.37.
34. Plaintiff’s total loss in the years 1946, 1947, and 1948 on all subcontracts involving radar antennae or equipment and entered into with Navy prime contractors prior to and after December 31,1945, amounted to $132,886.61.