Jones, Chief Judge,
delivered the opinion of the court:
This is a congressional reference case filed with this court pursuant to Senate Resolution 182, 86th Congress, 1st session, directing us to submit a report on the nature and character of the demand as a claim, legal or equitable, against the United States and the amounts, if any, legally or equitably due.[1] The petitioner seeks relief from certain losses which it sustained under a contract to produce mahogany lumber for the United States during the second world war. The full facts of this case are set forth in the report of the trial commissioner, infra, which we adopt in its entirety. However, it will be convenient at this point to review the pertinent facts in brief form.
Plaintiff is a Pennsylvania corporation engaged, during the years immediately prior to the events of this case, in the manufacture of upholstery material for automobiles. This corporation, and another, were wholly owned by Mr. Ray Springer and his family. In October of 1942, Mr. Springer was approached by representatives of the Resources Corporation International, a domestic corporation which, through its wholly owned subsidiary, held title to certain forest tracts near Sarabia, State of Oaxaco, Mexico. These individuals represented to Mr. Springer that their land contained a large stand of mahogany and other valuable hardwoods, and they provided Mr. Springer with the report of a survey made upon this land in 1941 by one Samuel Solis, a forester accredited under the Mexican Forestry Registration. That report contained an estimate which showed the existence of quantities of mahogany sufficient enough to make a logging operation commercially feasible.
Mr. Springer had no logging experience, but he knew that mahogany was in short supply and was thus persuaded by these representations that the exportation of mahogany logs from this tract for sale to the United States would prove *369 to be a profitable enterprise. Accordingly, he entered into an assignable option on the Mexican land which he subsequently exercised by purchasing the exclusive right to cut timber thereon for 5 years if only mahogany were sought, or for 20 years if he desired to cut other marketable species.
Mr. Springer entered into negotiations with representatives of the Government during which he provided them with the Solis report as evidence of the existence of mahogany trees on the Mexican tract. These negotiations culminated, in 1943, with the plaintiff corporation and the Defense Supplies Corporation entering into contract number 44-P-49 providing for the delivery by plaintiff of approximately 2,500,000 board feet of mahogany logs to the United States during the 1943 cutting season. This contract was signed by Mr. Springer as plaintiff’s president even though he had made no independent investigation of the existence of timber of any kind on the leased land. It is also a matter of record that Mr. Springer had been advised by his attorney and his accountant not to undertake a venture so fraught with the possibility of failure.
Contemporaneous with the execution of the above contract, the parties also executed contract number 44-M-l, known as the Lease contract, whereby the Government agreed to purchase approximately $125,000 worth of logging equipment, supplies and parts, and to lease this equipment to the plaintiff for a period of 3 years from the date of delivery. The plaintiff was to pay rent for this equipment with the option of applying these payments to the purchase of the equipment at any time prior to the expiration of the lease period. If the option to purchase were not exercised prior to such expiration, however, the machinery would then revert to the possession of the United States Government. The key provision of this contract, as it affects our case, was the condition that the leased equipment was to be used for no other purpose than the production and exportation of mahogany logs to the United States.
Plaintiff launched into the logging operation, expending approximately $150,000 of its own money for the construction of a logging access road and base camp, as well as for miscellaneous operating expenses. It was not until late 1943 *370 that Mr. Springer discovered that the amount of mahogany standing upon the land had been grossly misrepresented. As a matter of fact, the actual stand of mahogany was so sparse as to be insufficient to pay the expense of cutting and removing it from the logging area. This discovery touched off a series of communications between the parties extending over the period from June of 1944 to February 1945. In essence, the plaintiff sought to modify contract 44-M-l to permit it to utilize the Government-owned machinery to cut, for local sale, valuable hardwoods other than mahogany. Plaintiff hoped in this manner to mitigate or neutralize its losses. The Government eventually agreed to tills proposal, but only upon condition that plaintiff first pay to the United States all amounts then due and overdue for equipment rental. The plaintiff, claiming financial inability to do this, notified the Government that it was no longer possible to carry out the terms of contract 44-M-l, and that it stood ready to redeliver the machinery, parts and equipment received thereunder. In response to this notification, the Foreign Economic Administration sent an agent to Mexico to accept the delivery, only to discover upon his arrival that the property was in the physical possession of local creditors. Although the exact amount which was expended to secure the release of this equipment from these creditors is not known, the amount of $50,000 was advanced to the agent to be used for that purpose if necessary. It is known, however, that whatever the cost, the United States satisfied the local demands in June or July of that year, and regained possession.
Plaintiff readily admits its default on the contract, but nonetheless contends that this default was due solely to the misrepresentations of the landowners and the Solis report. It is plaintiff’s position that since Mr. Springer acted at all times in good faith in the service of his country, the United States in all fairness should have permitted the requested contract modification so that plaintiff could have mitigated its losses, or even made a profit. The plaintiff indicates that certain equities should be found in its favor due to the urgency of the wartime economic situation, the critical shortage of mahogany, and Mr. Springer’s willingness to assist the war effort.
*371 Regardless of the good intentions, however, it must be immediately apparent that the petition sets forth no legal claim. It is our opinion that were the operative facts of the case such that a legal right were created in the plaintiff, that right would be barred at the outset by the statute of limitations.[2] More than 14 years elapsed between the time that plaintiff abandoned its contract and the filing of the petition in this court. Plaintiff propounds two reasons why this statute should not be applied but we find both to be unpersuasive.
The plaintiff draws our attention to the fact that the Government did not at any time render a final accounting with respect to the repossession of the leased equipment. This fact, it is urged, has bearing upon the proposition that the statute of limitations does not begin to run until the parties come to and strike an account between them. The rule contended for has its application, of course, in a proper case.[3] But it has no validity if applied to the situation now before us. The rule has vitality only in cases involving mutual accounts or where the United States is placed in the position of a fiduciary with respect to the funds involved. In regard to mutual accounts, it is apparent that plaintiff misconstrues the meaning. Williston, in a general commentary on the subject, accentuates the weakness in plaintiff’s position:
* * * it is generally held essential, in order to constitute such an account as shall fall within the principle in question, that there shall be mutual open, current dealings and claims subject to a future final balance. [Williston, Contracts § 2030, adopted by this court in Hermann v. United States, 113 Ct. Cl. 54, 81 F. Supp. 830 (1949).]
There were no such mutual and open accounts in this case. Secondly, insofar as the plaintiff relies upon the creation of some sort of trust on the part of the Government, this court has made it clear that while every duty of a public officer is in the nature of a trust, one injured by the violation of such duty must bring legal action for relief within the period provided for by the law. Hermann v. United States, supra, at 60. *372 It cannot be disputed that the transactions set forth in this case do not establish any greater trust than that of a general nature as referred to in the Hermann case.
Plaintiff also contends that defendant’s failure to issue a formal termination of the contract prevented the statute from beginning to run. There is, of course, no fixed rule regarding the exact point in time at which a cause of action springs into being, entitling a plaintiff to bring suit. In contract situations, the terms and conditions of each particular agreement must be studied in relation to its own plane of reference in order to determine when that point is reached. Holton v. United States, 106 Ct. Cl. 477, 499 (1946). But it is a mistake to assume that the contract must be terminated by some clear-cut agreement of a formal nature in order to give rise to a cause of action in the plaintiff. The case before us is similar in that respect to Enright v. United States, 73 Ct. Cl. 416, 54 F. 2d 182 (1981), cert. denied, 286 U.S. 543 (1932). The plaintiff therein sought to avoid the bar of limitations on the ground that the Government’s written notice of termination was insufficient to start the statute running because it did not use explicit language such as “cancel” or “cancellation”, but had in lieu thereof simply notified the contractor to “suspend all work and hold up all commitments.” This court held that the subsequent conduct of the parties showed that neither party contemplated any further work under the contract unless other arrangements were made. It is just as clear to us now that neither the Government nor Mr. Springer contemplated any further performance of contract 44-M-l after the latter sent notice that plaintiff would no longer be able to continue. The plaintiff stated its intent to terminate, and the defendant indicated its acquiescence by sending its agent to Mexico to reclaim the leased property.
It is equally clear that on the merits the plaintiff has no legal claim. Reduced to its essence, plaintiff’s claim is that because of the peculiar wartime situation, the United States became obliged to protect plaintiff’s high-risk enterprise. We do not concur with that proposition. As we said in De Groot v. United States, 1 Ct. Cl. 97 (1864), aff'd 72 U.S. 419 (1866), prospective profits are allowed only when there has *373 been some breach by the party sought to be charged. In National Laundry Co. v. United States, 63 Ct. Cl. 626 (1927), a Government agent made an unauthorized statement to a prospective contractor that the laundry business he might expect to enjoy at a certain military reservation would approach $12,000 per week. In reliance upon that figure, plaintiff, as successful bidder, provided laundry facilities adequate to the anticipated task. When the business failed to approach the represented proportions, the plaintiff sued for lost profits. This court, in denying relief, said: “Their [the parties] opportunities for information on this matter were equal.” National Laundry Co., supra, at 629. This is an articulation of the consistent position of this court that the United States is not an insurer of any contractual undertaking. In still another case in this area, the plaintiff contracted to provide the Quartermaster Corps with needed supplies, but before delivery could be made those supplies were captured by enemy troops. The court denied the plaintiff lost profits. Grant v. United States, 1 Ct. Cl. 61 (1863), aff’d 74 U.S. 331 (1868). All this goes to show that lacking fault on the part of the Government, there is no obligation on its part to guarantee any contractual party a successful venture.
All that we have said thus far is equally applicable to the issue of whether the plaintiff is entitled to equitable relief. Counsel for the defendant calls our attention to the recent decision of this court in Teutsch v. United States, 153 Ct. Cl. 86, 288 F. 2d 920 (1961), and we agree that the principle enunciated therein is the proper one to be applied to the case before us. In that case the plaintiff, with no prior experience in mining, obtained an NFC loan to embark upon business of mining ceramic and lava talcs for use as dielectric material for electronic spacers. Because the need for lava talc was the greater, the Government urged the plaintiff to emphasize the production of that mineral in preference to ceramic talc. Unfortunately, the mining of lava talc could not be undertaken at a profit and plaintiff’s ceramic talc business never became developed to the point where it would offset the losses sustained. When plaintiff sued to recover its profits, the court said:
*374 We feel that unless the United States was directly responsible for some restraint on plaintiff’s production of ceramic talc or for the loss of markets for that item, there can be no equitable obligation upon the United States. [Teutsch, supra, at 91.]
If anything, the position of the present plaintiff is even weaker than that of its counterpart in Teutsch, in that in this case the initiative to cut mahogany was entirely upon the plaintiff.
Though plaintiff’s impetration regarding its support of the war effort reflects a commendable attitude, the plaintiff in Teutsch was no less well motivated. Mr. Springer entered this undertaking with every assistance from the Government, and, although the risk was great, the potential profits were correspondingly high. In that light the equities, if any, lie on the side of the United States, especially since the losses of the Government were at least as large, possibly larger, than those of the plaintiff.
Since we are of the opinion that the plaintiff is neither legally nor equitably entitled to compensation for its losses, we need not consider the issues raised concerning the propriety of certain elements of damage.
This opinion and the findings of fact incorporated herein will be certified by the Clerk to the Congress pursuant to Senate Resolution 182,86th Congress, 1st session.
EINDINGS OP FACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a corporation organized under the laws of the Commonwealth of Pennsylvania and until its mill was sold in 1943, it had successfully engaged in the manufacture of upholstery material for automobiles. Both plaintiff and the Feltex Corporation were wholly owned by Ray W. Springer, his wife, and four children, Mr. Springer being the principal executive officer of both corporations. On February 9, 1943, both companies were in good financial condition.
*375 2. Plaintiff’s petition was filed pursuant to S. Res. 182, 86th. Congress, 1st Session, which reads as follows:
Resolved,, That the bill (S. 2496) entitled “A bill for the relief ox Kraemer Mills, Incorporated”, now pending in the Senate, together with all the accompanying papers, is hereby referred to the Court of Claims; ana the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amounts, if any, legally or equitably due from the United States to the claimant.
3. In October 1942, Mr. Springer was approached by several individuals representing the Resources Corporation International, which owned a tract of forested land in the State of Oaxaco, Mexico, the title to which land was held by its wholly owned subsidiary, Mexico Land Securities Company. They gave him a copy of a report made in 1941 by Samuel Solis, a forester accredited under the Mexican Forestry Registration. The report contained an estimate that there was a stand of mahogany and other hardwoods on the Mexican tract sufficient to produce large quantities of merchantable mahogany and other valuable timber. From pamphlets issued by the Board of Economic Warfare, Mr. Springer learned that mahogany was a critical material which was needed during the war. After being told by the representatives of the owner of the land that the mahogany venture would be profitable, he was persuaded that it would be a sound business undertaking for the plaintiff corporation. Sometime prior to October 26,1942, he sent a representative to talk with Newton H. Foster of the Board of Economic Warfare and, as a result, Mr. Springer concluded that plaintiff could make a satisfactory contractual arrangement with the Government for the production of mahogany in Mexico and for its importation into the United States.
4. On November 20, 1942, Mr. Springer, through his attorney, Ezra Frye, obtained an assignable option from the Mexico Land Securities Company which, when exercised, would give the optionee the exclusive right to cut and re *376 move timber from approximately 25,000 acres of land in Oaxaco, Mexico, described as the Boca del Monte Tract and the Fomento No. 1 Tract. Shortly thereafter in discussions with Mr. Foster, Mr. Springer learned that the authorized Government contracting agency for the type of contract desired was the Defense Supplies Corporation. He then negotiated with the vice president of that corporation to obtain a contract for the importation of mahogany and to secure financial assistance for the purchase of machinery required for the logging operation in Mexico. In the negotiations, the Government representatives requested Mr. Springer to present some evidence as to the presence of mahogany trees on the land in Mexico, and he left the original of the Solis report with them.
5. On December 22, 1942, the Defense Supplies Corporation sent plaintiff a letter of intent, stating that the corporation proposed to enter into a contract with plaintiff for the importation of mahogany logs to be produced in the State of Oaxaco, Mexico, during the 1943 cutting season. The letter also stated that Defense Supplies would enter into a contract with plaintiff, whereby the Government would expend approximately $90,000 for the purchase and delivery of logging machinery and equipment at the site of the operations in Mexico and would lease such machinery to plaintiff upon specified terms for the purpose of producing mahogany. Both parties understood that the laws of Mexico required the logging operations to be conducted in that country by a Mexican corporation, and Mr. Springer stated that he proposed to organize, under the laws of Mexico, a subsidiary to be known as Maderas Nacionales de Mexico, hereinafter called Maderas. Therefore, the letter of intent stated that plaintiff would in turn make the machinery and equipment available to Maderas and that both it and plaintiff would agree to use it exclusively for the production of mahogany logs to be imported into the United States pursuant to plaintiff’s contract for the importation of mahogany.
6. On December 28, 1942, Mr. Frye assigned the option on the Mexican land to plaintiff, and on January 30, 1943, plaintiff exercised the option by entering into a contract with Mexico Land Securities Company, granting to plaintiff the *377 exclusive right to cut and remove mahogany and other merchantable timber on the 25,000-acre tract in consideration of the payment by plaintiff of stipulated amounts per thousand board feet of timber cut. The contract was to run for a term of 5 years from January 1, 1943, if only mahogany and other selected species were cut, but it was to run for a term of 20 years from January 1, 1943, if plaintiff elected to cut other merchantable species of timber.
7. Mr. Springer embarked upon the mahogany venture against the advice of his attorney and his accountant, both of whom had represented the Springer family corporations for many years. They pointed out that while he had a good reputation as a manufacturer in this country, the mahogany project would require an investment of $150,000 or more in a business with which he had had no previous experience and would involve operations in a foreign country where he would probably encounter labor problems and other difficulties.
With respect to the stand of mahogany on the land, Mr. Springer made no independent investigation but relied on the statements made to him by the representatives of the owner and the estimates contained in the Solis report.
8. On February 9, 1943, plaintiff and Defense Supplies Corporation entered into a contract for the importation of mahogany logs. It was designated as contract no. 44-P-49 and in substance provided:
(a) Plaintiff was authorized to procure mahogany logs conforming to the specifications set out in the contract for sale to Defense Supplies and agreed to procure and import into the United States 2,500,000 board feet of mahogany to be produced during the 1943 cutting season in the State of Oaxaco, Mexico, and shipped from Sarabia in that country. The corporation agreed to purchase all such mahogany logs complying with the specifications from plaintiff at a price equivalent to the direct cost of procurement and immediately thereafter to resell the same to the plaintiff at the same price.
(b) Plaintiff agreed to process and dispose of the imported logs in accordance with applicable orders and regulations of the War Production Board and the Office of Price Administration.
*378 (c) Plaintiff agreed to indemnify and hold tlie corporation harmless from any liability or damage arising out of plaintiff’s mahogany operation.
9. Contemporaneous with the execution of the above-described contract, plaintiff and the Defense Supplies Corporation also entered into contract no. 44-M-l, hereinafter referred to as the lease contract. It was specified that both contracts formed one agreement. The lease contract, in substance, provided that:
(a) The corporation agreed to purchase and deliver to plaintiff in Sarabia, Mexico, approximately $125,000 worth of logging machinery, equipment, supplies, and parts;
(b) Exhibit A to the lease contract was a schedule describing tractors, trucks, chain saws and other logging equipment and machinery which Defense Supplies agreed to lease to plaintiff for a term of three years from date of delivery, on condition that the machinery be used solely for the production of mahogany logs for import into the United States pursuant to contract no. 44-P-49.
In consideration for the lease, plaintiff agreed to pay monthly installments of rent equal to one-twelfth of 25 percent of the cost of the machinery for the first year of the lease term and monthly installments of rent equal to one-twelfth of S7y2 percent of the cost for the last two years of the term of the lease. Plaintiff was also granted an option to purchase all of such machinery at the cost thereof, less the amount of rent paid, provided it purchased the entire lot before the contract was terminated.
(c) Defense Supplies consented to the sublease by plaintiff of all of the leased items to Maderas, provided the equipment was exclusively for the production of mahogany logs for import into the United States and provided further that both plaintiff and its sublessee would be jointly liable for all obligations under the contract.
(d) Exhibit B to the lease contained a list of small tools, parts, and expendable equipment to be purchased and delivered by Defense Supplies to plaintiff in Mexico. With respect thereto, it was agreed that upon the delivery of such material in Mexico, it would be sold to plaintiff at cost, which was to be repaid by plaintiff within six months after delivery.
*379 (e) It was further agreed that upon default of any of the obligations of the lease or of the contract covering the importation of mahogany logs, or upon termination of that contract, Defense Supplies could terminate the lease and take immediate possession of the machinery. The lease contract also provided:
* * * * *
IV. Upon the termination of this lease by lapse of time or otherwise, Lessee shall forthwith yield and place Corporation in peaceful possession of all of the machinery leased hereunder, in the same condition as delivered to Lessee, reasonable wear and tear excepted, free and clear of all liens and claims, other than those resulting from claims against Corporation, and Corporation shall in addition have the right and Lessee hereby grants to Corporation the right to enter at all times on the Lessee’s premises to examine said Machinery and remove same after the termination of this lease.
Hi H* H* H*
10. By an amendment to the lease contract dated July 27, 1943, Defense Supplies and plaintiff agreed with respect to the heavy machinery listed in Exhibit A of the contract that, upon the delivery of the equipment in Mexico, it was leased to plaintiff for a term of 3 years in return for a rental payable in installments of $2,500 each on August 1, 1943, and a like sum on the first day of each of the succeeding 11 months, and the sum of $3,750 on August 1,1944, and a like sum on the first day of each month thereafter until the rental payments equaled the cost of the purchase and delivery of such machinery.
With respect to the handtools and expendable equipment described in exhibit B of the lease contract, the parties agreed that upon the delivery of such equipment in Mexico plaintiff would repay the cost thereof as follows: $3,000 on December 1,1943, and the balance on March 1,1944.
The lease contract was further amended on December 29, 1943, whereby an additional $2,359.36 worth of machinery was purchased by Defense Supplies and added to exhibit A and $5,443.19 worth of handtools and expendable equipment was purchased by Defense Supplies and added to exhibit B.
11. Under the lease contract and amendments thereto, the Government purchased and leased to plaintiff machinery *380 described in exhibit A of the lease documents at a total cost of $133,299.66 to Defense Supplies. In addition, the Government purchased and delivered to plaintiff handtools and expendable equipment listed in exhibit B of the lease documents, at a cost to Defense Supplies of $10,804.59, which amount was to be repaid in full by plaintiff.
12. On April 16, 1943, the articles of incorporation of Maderas were duly executed and filed in accordance with Mexican law. Sometime thereafter, plaintiff also organized another Mexican subsidiary corporation, Fomento de Ma-deras, which was apparently formed to operate the sawmill. Both of these were dummy corporations and all the stock in both companies was transferred to Kraemer Mills and the Feltex Corporation immediately after the Mexican companies were formed.
13. In view of the time required for the purchase and shipment of the machinery and the employment of a working staff, Maderas did not begin operations on the Mexican tracts until the last quarter of 1943. An aerial survey of the land was made to ascertain the location of the stand of timber and to provide information for the construction of a logging road. When completed, the logging road covered a distance of about 22 miles. A campsite building was erected to house key personnel, to provide an office for them, to store spare parts, and to serve as a repair shop. At the height of the operation, Maderas had from 50 to 60 employees, including a business manager, logging superintendent, and members of the cutting crew. Some mahogany, the quantity of which is not disclosed by the record, was imported and sold to companies in the United States for use in the manufacture of PT boats and gliders. The operations of both Mexican corporations terminated during the last quarter of 1945.
14. Under date of December 3, 1943, the Foreign Economic Administration, which by that time had succeeded the Board of Economic Warfare, wrote plaintiff as follows:
_Our Mexican office has forwarded representations received from the Mexican Govermnent alleging that a permit issued to Mr. James B. Barker, who represents the Boca del Monte tract, upon which we understand you hold cutting rights and which is the property of the Mexican Land & Securities Company; authorizes Barker *381 to exploit every year for 5 years, 800 cubic meters of mahogany logs. This is approximately 160,000 feet board measure. We are given to understand that upon this cutting permit your production of mahogany depends.
Representations were also made that the total area of the Boca del Monte tract, according to correspondence, deeds and maps is 7,337 hectares; of this not more than 1,500 hectares, it is said, can be considered exploitable forest lands.
We should appreciate a letter from you clarifying this matter for us, since the existing contract between your company and the Defense Supplies Corporation calls for production of 2,500,000 board feet of mahogany logs during the year 1943. From the information we have it appears that your Mexican Government cutting permit may be inadequate.
Sometime thereafter, Mr. Springer went to Mexico to investigate the extent of the mahogany stand. By February 1944, the logging road had been sufficiently completed to allow exploration of the forest. The logging superintendent and cutting crews who explored the timber promptly reported that the stand of mahogany was very sparse and insufficient to pay the expenses of cutting, removing, and shipping it. However, the exploration indicated that there was a good stand of other merchantable species of timber.
After receiving this information, Mr. Springer returned to the United States and in June of 1944 called on Newton Foster, Chief of the Mahogany Section of the Foreign Economic Administration. Mr. Springer explained that the extent of the mahogany stand on the land had been grossly misrepresented to plaintiff and requested that plaintiff and its subsidiary be permitted to use the Government-furnished machinery and equipment in the logging of other merchantable timber for sale in the Mexican market and for importation into the United States. At Mr. Foster’s suggestion, plaintiff submitted a written request dated June 21, 1944, in which plaintiff stated that in view of the misrepresentations made regarding the quantity of mahogany on the land, plaintiff and its subsidiaries had not been able to produce the required quantity of mahogany logs meeting the specifications of the contract and that it would be impossible to profitably continue the operation on the basis of mahogany *382 production alone. Therefore, plaintiff asked that it be allowed to use the machinery and equipment to log and sell other merchantable species of timber. Plaintiff’s request was repeated in a subsequent letter of July 12, 1944, which read in part as follows:
As of July 1, 1944, we have upwards of $115,000.00, cash (exclusive of rental payments made to Defense Supplies Corporation) invested in land; stumpage option payments; aerial survey; engineering; buildings; good roads and cruising. The erection of a sawmill and other expenditures will entail an additional $50,000.00 in capital investments by the end of 1944.
We have an organization tuned to carry on the operations which will produce all the mahogany saleable under our contract with Defense Supplies Corporation; plus secondary woods for the Mexican market, in such quantities as will make an economical operation.
The logging of mahogany, only, is very expensive and, needless to say, our costs can be reduced materially if we are permitted to cut other species as we come to them. We have the necessary cutting permits from the Mexican Government and we could start immediately upon receipt of your approval — particularly? in view of the reduced demand for mahogany at this tune.
With the investment we have in this project, it is readily understandable that it is not our intention to return this equipment under lease, upon termination of the war with the Axis countries. We anticipate that our operations will carry on for many years, and the machinery will be our property upon completion of the three year lease.
15. On July 27, 1944, plaintiff received a letter from the vice president of the U.S. Commercial Company, successor to Defense Supplies Corporation, transmitting a proposed amendment to the contract. The amendment, if executed, would have granted plaintiff’s request for the logging of timber other than mahogany, subject to plaintiff’s compliance with other conditions. Although the amendment is not in evidence, the conditions upon which the permission was granted were set forth in the last paragraph of the letter as follows:
It appears from USCC invoice of July 8,1944, that your past due obligations as of July 1, 1944 amount to $7,142.19. Under the terms of the proposed amendment, *383 you will in addition become obligated to USCC for the increased monthly rentals at the rate of $200 per month. Since the rentals commenced on August 1, 1943, this additional sum as of July 1, 1944 is $2,200. Before concluding the proposed amendment, we shall require payment of these two sums, or a total of $9,342.19, plus any additional rentals falling due before final execution of the amendment.
16. By letter of September 12, 1944, plaintiff advised the Foreign Economic Administration that in view of the plaintiff’s large cash investment in the Mexican logging operation, plaintiff would not be able to comply with the conditions imposed by defendant’s letter of July 27,1944, and requested an extension of time in which to make the past due payments. The letter also stated that Maderas had entered into contracts with two veneer operators in Mexico to supply all their timber requirements other than mahogany and that these contracts, together with orders from the Mexican Railroad Company for ties, would enable plaintiff to make payments in the period from October 1,1944 to January 1,1945, totaling $29,293.
On September 29, 1944, plaintiff sent a check for $5,000 to apply on its indebtedness. Receipt of the check was acknowledged by the Foreign Economic Administration on October 6, 1944, with the statement that the acceptance of the check would not constitute an agreement for the extension of time requested by plaintiff. Plaintiff was also requested to furnish a balance sheet showing its fiscal condition at that time.
17. On November 9, 1944, the Foreign Economic Administration wrote plaintiff that, since it had failed to execute and return the proposed amendment to the contract, the amendment was not in effect; that plaintiff’s Mexican subsidiary was using the leased equipment for the production of various types of timber in violation of the contract; that plaintiff’s past-due balance under the contract amounted to more than $20,000; that plaintiff had failed to submit a profit and loss statement and a balance sheeet as requested and that, unless these various matters were adjusted, it would be necessary for the Government to declare the lease in default.
*384 18. Under date of December 23, 1944, plaintiff submitted a counter-proposal to the Foreign Economic Administration in which in return for the Government’s permission for plaintiff to cut all merchantable species of the trees on the tract and to extend the term of plaintiff’s contract for importation of mahogany to December 31, 1945, plaintiff would agree to pay $4,000 at the time the proposed amendment to the contract was approved — $4,000 within one month thereafter, $4,000 within two months thereafter, and $20,000 within three months from the date the supplemental contract was approved. Plaintiff further agreed that if its request was approved, it would pay a minimum of $5,000 per month during the months of May, June, July, and August 1945. Additional amounts were to be paid out of the operating profits of Maderas after allowing it to retain $5,000 per month out of such profits.
19. On January 6, 1945, the Foreign Economic Administration replied that, since plaintiff’s proposal did not conform to an arrangement which the parties had discussed in a conference of December 8, 1944, and since the arrears in plaintiff’s account were increasing monthly, the Government was unwilling to proceed on the basis of plaintiff’s proposal. The letter further stated:
* * * However, we are anxious to give you every reasonable opportunity to meet your obligations under this Contract, and we therefore make the following suggestion:
1. You pay $4,000 on or before January 15,1945, and a like sum each month thereafter until execution and delivery of an amendment to the above Contract.
2. Upon receipt of the payment due on January 15, 1945, we shall negotiate with you for an amendment to the above Contract substantially in accordance with the following terms and conditions:
(a) The Feltex Corporation must become a party to the Contract as amended and be primarily liable to U.S. Commercial Company.
(b) In case of Lessee’s exercise of its option to purchase, the unpaid balances of the purchase price will carry interest at 3% per annum computed from January 1,1945.
(c) A payment of $20,000 must be made on or before March 15, 1945 with payments of $5,000 each month *385 thereafter through the month of August 1945, and thereafter monthly payments of $4,000 until the full amount has been paid.
(d)In addition to the payments above specified, you shall pay further sums to be computed upon the profits, if any, of Maderas Nacionales de Mexico S.A., as follows:
(i) For each of the months from May through Au-?ust 1945, inclusive, you shall pay to U.S. Commercial ¡ompany a sum equal to one-half of the amount by which the operating profits (without deduction for depreciation) of Maderas Nacionales de Mexico S.A. for each month exceed the sum of $5,000. The regular monthly payment of $5,000 shall be deemed to be an operating expense for the purpose of computing the above operating profits.
(ii) For the last four calendar months of 1945, you shall pay to U.S. Commercial Company a sum equivalent to one-half of the amount by which the operating profits (without deduction for depreciation) of Maderas Na-cionales de Mexico S.A. for each month exceed the sum of $2,000. The regular monthly payments of $4,000 shall be deemed to be operating expense for the purpose of computing said operating profits.
(e)The machinery covered by the Contract shall be used exclusively for the purpose of producing mahogany and other species of wood in the production areas adjacent to Sarabia, Mexico, provided, however, that U.S. Commercial Company may, at its option and after 90 days notice to Lessee, require that said machinery be used solely for the purpose of producing mahogany in Mexico for import into the United States.
(f)Pending execution and delivery of an amendment to the above Contract, it must be understood that such contract, as previously amended on July 27, 1943 and on February 9,1944, remains in full force and effect and that neither party to the Contract is committed to any modification thereof.
20. On February 14,1945, plaintiff wrote the Foreign Economic Administration that it could not accept the terms proposed by the Government and that in view of plaintiff’s serious operating losses, it could no longer continue with the performance of the contract and was prepared to redeliver to the Government the machinery and equipment listed in exhibit A of the lease contract.
21. As of February 14,1945, when plaintiff sent the above- *386 described letter, the total cost to the Government of the machinery leased to plaintiff was $133,299.66, against which plaintiff had made payments of $27,997.19, leaving a balance of $105,302.47. As of February 14, 1945, plaintiff was in default in payments on the lease in the amount of $28,213.51.
With respect to the equipment furnished by the Government (described in exhibit B to the lease contract) and which was to be purchased and paid for by plaintiff, the total cost of such Government-furnished equipment amounted to $10,408.59, the total credits against that charge were $9,199.45, and the unpaid balance as of June 25, 1945, was $1,209.14.
22. About March 24, 1945, the Foreign Economic Administration sent Warren G. Libby to Mexico to take possession of the equipment leased to plaintiff (exhibit A of the contract). On March 26, 1945, plaintiff designated Augustin H. Rosenblueth, business manager of Maderas, to make arrangements for delivery of the machinery to Mr. Libby, but difficulties and delays were encountered. Mr. Rosenblueth resigned his position in Maderas and deposited the records of the company with a law firm in Mexico City. Plaintiff did not learn of this until April 6, 1945. On May 26, 1945, plaintiff employed Efren Torres Chavez, a lawyer in Mexico City, to liquidate the assets of Maderas and to release the machinery to Mr. Libby. In the meantime, on or about June 11,1945, Mr. Libby reported to U.S. Commercial Company that various unpaid creditors of Maderas were asserting claims against that company in the amount of approximately $35,000 and that the labor creditors had taken physical possession of the logging equipment. Although he was unable to ascertain how much would have to be paid the creditors in order to obtain a release of the machinery, he was advanced the sum of $50,000 for paying such claims as were necessary to obtain possession of the machinery. About July 1, 1945, the Government took possession of the machinery in Mexico.
23. Sometime prior to June 18, 1945, U.S. Commercial Company prepared and sent to plaintiff a proposed settlement agreement to be executed by plaintiff, by Maderas, and by U.S. Commercial Company, covering the rights and obli *387 gations of the parties accruing on termination of the lease contract and the redelivery of the leased machinery to defendant. The proposed agreement was revised by plaintiff, executed by it, and forwarded to U.S. Commercial Company on June 18, 1945, but so far as the record shows, the agreement was never executed in behalf of defendant. With respect thereto, on June 25, 1945, U.S. Commercial Company wrote plaintiff in pertinent part as follows:
The settlement agreement does not contain all of the provisions which we deem necessary. However, we shall submit it in its present form to our representative in Mexico and advise you further.
It is our understanding that you either have instructed or will instruct Señor Chavez to cooperate with our representative in Mexico in securing proper execution of the settlement agreement by Maderas Nacionales de Mexico, provided, of course, the agreement proves acceptable to our representative.
24. Plaintiff has never received either from defendant or from plaintiff’s attorney in Mexico a statement showing a list of the machinery and equipment redelivered to or repossessed by the defendant, nor the amount realized on the resale thereof by U.S. Commercial Company. Further, the evidence does not show how much defendant’s representative in Mexico had to expend to satisfy the claims of the creditors of Maderas and for other purposes in order to obtain possession of the machinery.
25. Señor Chavez, the attorney appointed by plaintiff to liquidate the assets of plaintiff’s Mexican subsidiaries, took possession of the records of both of the companies and all of the assets except the leased machinery that defendant received. He sold some of the assets, including mahogany logs which failed to meet the specifications of plaintiff’s mahogany importation contract, and applied the proceeds on the claims of creditors. The evidence does not establish when he completed the liquidation of the corporations, but in November 1946, he informed a representative of plaintiff that three of the creditors of Maderas, whose claims aggregated about $4,000, had issued attachments against the assets of the company and that plaintiff owed the attorney $2,000 for services performed up to that date. Plaintiff has not paid *388 the fees charged by him and he has retained the books and records of the two companies in his possession. He has never furnished plaintiff with a financial statement or other written report showing the results of the logging operations in Mexico or the status of the liquidated companies.
Mr. Springer did not go to Mexico during the period when the Government undertook to regain possession of the leased machinery, because of advice from his attorney that the creditors of the Mexican corporations were in an angry mood and that Mr. Springer would suffer bodily harm if he appeared in Mexico.
26. About 1952 Mr. Springer consulted Harry Toy, a Detroit attorney whom he had known for many years, for the purpose of employing Mr. Toy to prosecute the claim involved in this action. However, Mr. Toy was not employed because neither Mr. Springer nor plaintiff was able to pay the retainer demanded by the attorney. Mr. Springer also consulted Roy Weiss, another Detroit attorney who frequently traveled in Mexico. Mr. Weiss investigated plaintiff’s claim to some extent, but he was never employed to represent plaintiff in connection with the claim in suit because of its financial inability to pay the retainer he requested. At some time not shown in the record, Mr. Springer also talked with Ezra Frye, the attorney who had represented him in organizing plaintiff’s affiliates in Mexico, about this claim but Mr. Frye was in ill health at the time and has not represented plaintiff in the prosecution of that claim.
Sometime after the above-described consultations with attorneys, Mr. Springer was in Washington, D.C., and learned from a former congressman that plaintiff was not required to retain counsel to prosecute this claim. Thereafter, Mr. Springer presented it to Congress. With the assistance of his wife, who had had about two years’ legal education, he also prepared the petition filed herein.
27. Plaintiff’s claims in this action comprise four principal items totaling $451,587.71. The facts pertinent thereto are summarized as follows:
(a) Claim for disbursements by plaintiff to the two Mexican corporations — $176,361.81.
*389 Although some checks and other supporting documents are unavailable, the evidence is sufficient to establish that plaintiff made net disbursements in the form of capital investment, cash advances, loans, and amounts paid for supplies and services to or for its two Mexican affiliates in the sum of $171,141.51. A small part of this amount was advanced by the Feltex Corporation in the form of loans to plaintiff, which disbursed the proceeds of the loans. No portion of the amount disbursed to or in behalf of plaintiff’s Mexican subsidiaries has been repaid to plaintiff, to the Feltex Corporation, or to any member of the Springer family. An indeterminate portion of the money supplied by plaintiff was used by the Mexican companies in the logging and sale of timber other than mahogany. Since the records showing the results of the operations of the two Mexican concerns have never been made available to plaintiff, the evidence does not establish either the causes or the extent of any losses sustained by those companies in the timber operation. Also, the evidence does not show the financial results of the logging and sale of timber other than mahogany. Plaintiff has not established that any loss sustained by its Mexican affiliates or their failure to reimburse plaintiff for the disbursements made to them was caused by the failure or refusal of defendant to amend plaintiff’s contract to authorize the logging of timber other than mahogany or by any other act or omission of defendant.
(b) Interest claimed — $158,725.63.
This claim is for interest computed at the rate of 6 percent per annum on plaintiff’s principal claim of $176,361.81 for the 15-year period from 1945 to 1960.
(c) Cost of processing plaintiff’s claim — $2,500.
This claim is not supported by any books or records. It consists of an estimate made by Mr. Springer of costs incurred by plaintiff for travel, correspondence, photostatic copies of records, and the preparation of various papers and reports in the processing of plaintiff’s claim.
(d) Computed loss in the purchasing power of the dollar due to inflation during the period from 1945 to 1960— $114,000.27.
This item of the claim is for the loss plaintiff asserts it *390 suffered through reduction in the purchasing power of the 1945 dollar because of inflation. It has been computed on the basis of plaintiff’s principal claim of $176,361.81 and the Department of Labor Consumer Price Indices between 1945 and 1960.
28. S. 2496, the bill referred to the court by the resolution quoted in finding 2, provides in part:
That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Kraemer Mills, Incorporated, of Detroit, Michigan, the sum of $180,000, in full satisfaction of all claims of such company against the United States for reimbursement for losses incurred under contract numbered 44-M-l, dated February 9,1943, entered into between such company and the Defense Supplies Corporation, a Federal agency.

 Since the evidence in this case was taken, and the findings of the trial commissioner reported prior to the opinion of the Supreme Court in Glidden Co. v. Zdanok, 370 U.S. 530 (1962), we think it proper to file the report without reference to the Supreme Court’s opinion in that case.

 The statute Is jurisdictional In this court. United States v. Wardwell, 172 U.S. 48, 52 (1898).

 See, e.g., The Louisville & Nashville RR Co. v. United States, 47 Ct. Cl. 129 (1911), and cases cited therein.