Dueeee, Judge,
delivered the opinion of the court:
This case has been referred to us by House Resolution 493, 83rd Congress, 2nd Session transmitting H.R. 3965, 83rd Congress, 1st Session. We are instructed to report on that bill particularly apprising the House of “findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.”
Plaintiff’s claim is for the loss of expected profits as a result of mining lava talc rather than ceramic talc during World War II. Plaintiff acquired the leasehold to the Johnny Gulch Talc Deposits near Ennis, Montana in 1941, and he operated it thereafter as the Mountain Talc Mines. He has arrived at a figure which he claims represents his losses by applying the following formula. The ceramic talc operations at the mines realized a claimed average profit margin of 26 percent; had he expended the same amount of *88 money on producing and marketing ceramic talc during parts of 1943,1944 and 1945, as be did on lava talc, bis total profits would have been $14,882.00. In addition, be claims that because be devoted bis efforts to producing lava talc during the war at the insistence of the government be lost the markets which be would have bad for ceramic talc for a period of three years following termination of the lava talc operations in November 1945. The lost profits for this period are claimed to be $10,026.00 resulting in a total claim of $24,908.00.
There were present at the Mountain Talc Mines deposits of both lava talc (sometimes called block talc) and ceramic talc. Both were of steatitic quality, meaning that they were a suitable dielectric material for electronic spacers and insulators. The ceramic talc was ground to powder and fashioned into electronic products by being combined with a suitable binder. The lava talc dielectric elements were fashioned or carved from whole pieces of the mineral. Inasmuch as lava talc is fragile great care in handling is required during its mining. Ceramic talc, on the other hand, can be removed by blasting since it must be reduced to powder anyway before it can be used. Lava talc is, therefore, relatively expensive to mine and it cannot usually be accomplished at a profit.
Until 1942, the plaintiff had worked as a tool salesman and had had no schooling or experience in mining. He had acquired the leasehold to the property called the Mountain Talc Mines in 1941 but the talc deposits were at that time undeveloped. In November 1942, the Bureau of Mines, at plaintiff’s request, obtained analyses of ore samples from his leasehold. As a result of a favorable laboratory report the Bureau of Mines prepared War Minerals Beport 178 which concluded that a superior grade of lava talc was to be found at the Mountain Talc Mines. In fact it was the most suitable such deposit of lava talc to be found in the United States. The prewar supply of this mineral had come primarily from Italy and India but it had been cut off at the outset of the war. As a result of the report, the Bureau of Mines approved the building of an access road to the properties by the U.S. Forest Service.
*89 After War Minerals Eeport 178 bad been published the plaintiff and the Bureau of Mines entered into an agreement (more fully set forth in Finding No. 5) which granted the Bureau of Mines exploration rights on plaintiff’s leasehold. The exploration work was subsequently described in War Minerals Report 343 in February 1945.
Prior to the publication of either of the reports, in January 1943, the Reconstruction Finance Corporation, which was interested in plaintiff’s mine as a source of lava talc, had authorized a loan of $7,500 to the plaintiff who in turn executed two notes, due in January and June, 1944 in the amounts of $5,000 and $2,500, respectively. Pertinent portions of the loan agreement between the parties are set forth in Finding No. 7. Between March 1943 and November 1945, plaintiff produced 528,868 pounds of lava talc and about 2,925,000 pounds of ceramic talc.
Plaintiff submitted a claim for losses on the operation of his mines and for expected profits in the amount of $55,932.37 to the RFC in 1946. In addition to the items presented in this suit, the claim included losses incurred in mining the lava talc, mitigation costs and settlement expenses. The RFC did not believe it had the authority to settle the claims for expected profits there asserted. But in July 1947, plaintiff and the RFC entered into a final settlement agreement pursuant to the Contract Settlement Act of 1944, 58 Stat. 649, 665; 41 U.S.C. 117, wherein it was agreed “that all rights and liabilities of the parties under the Act shall cease forthwith and be forever released” and the sum of $24,325.00 (less $6,774.96 representing the unpaid principal on plaintiff’s loan from RFC) was authorized to be paid to the plaintiff.
The petition alleges no contractual obligation which supports the claim and the only statutory provision which could support it is section 17(a) of the Contract Settlement Act of 1944, supra, which provides, in pertinent part:
Where any person has arranged to furnish or furnished to * * * a war contractor any material * * * related to the prosecution of the war, without a formal contract, relying in good faith upon the apparent authority of an officer or agent of a contracting agency, written or oral instructions, or any other request to *90 proceed from a contracting agency, the contracting agency shall pay such person fair compensation therefor.
The settlement agreement worked out pursuant to the Act between the RFC, on its own behalf and on behalf of the Metals Reserve Company, and the plaintiff was called a final settlement agreement and provided, in part, that all of the rights of the parties would be forever released. The plaintiff entered into this agreement knowing that the RFC was aware that portions of his claim were for lost profits and further knowing that it had rejected those portions because they lay outside of the scope of the Act. Nevertheless, no reservation of any portions of the claim as originally stated was noted in the settlement agreement. Rather the agreement purported to be in settlement of all rights under the Act. The execution of the agreement constituted a release, waiver, or abandonment of those portions of the claim relating to lost profits on ceramic talc. The only legal rights which plaintiff had were those created by the Contract Settlement Act which he released for a valuable consideration.
Furthermore, the statute of limitations of this court, section 2501 of Title 28, U.S.C., operates to bar any legal rights which the plaintiff might have had. The petition pursuant to the legislative reference was filed on January 5, 1955, which date is not only more than six years after the date on which plaintiff ceased to mine lava talc, but also more than six years after he entered into the settlement agreement with the RFC.
Having examined the question of whether or not plaintiff has an equitable claim against the United States we are of the opinion that he has not. The RFC loan was made to Mr. Teutsch so that he could produce talc for the war effort and it was determined that the need for lava talc was of greater urgency than the need for ceramic talc. Consequently, he was urged on a number of occasions to concentrate his efforts on that type of production. However, he was never forbidden to produce ceramic talc.
It is true that the early advice about the possible utilization of plaintiff’s claims in furthering the war effort envisioned the production and marketing of ceramic talc at a profit in *91 order to offset tbe losses which would be incurred in the production of lava talc. It is also a fact that the ceramic part o £ plaintiff’s operations never materialized to the point where it could offset the losses from lava production. However, the United States in its settlement under the Contract Settlement Act compensated plaintiff for his production losses. It assumed and discharged the obligation to make up the losses when no profitable ceramic sales developed to do it.
We feel that unless the United States was directly responsible for some restraint on plaintiff’s production of ceramic talc or for the loss of markets for that item, there can be no equitable obligation upon the United States. And thorough examination of all of the evidence in the case convinces us that such was not the situation.
Without the money derived from the RFC loan, Mr. Teutsch could not have operated as efficiently nor could he have operated on the scale which he did. In addition to the funds made available to plaintiff from the loan, the defendant offered advice and assistance directed toward the production and marketing of talc. It obtained the services of an experienced foreman to oversee operations and the exploratory work of the Bureau of Mines went on during the period of plaintiff’s wartime production. It appears, however, that the advice of the experienced persons connected with the operations was not always followed.
The problem of securing and retaining markets for ceramic talc is a complex one involving experience in mining, research and business administration. The cultivation of customers whose specific needs can be satisfied requires a much more intensive effort than does the marketing of metallic ores. The plaintiff did not have significant markets for ceramic talc at the beginning of the period for which the claim is made. It is doubted that he had enough experience and know-how in this field at this time to have successfully developed ceramic markets even had he had greater resources.
The mine itself was a promising “prospect” but it had not been developed to produce either kind of talc with the efficiency demanded to compete successfully. To have attained such a degree of development would have required expensive and extensive improvements in the producing facilities. In *92 1948, plaintiff sold the leasehold interest in the mines to the Sierra Talc & Clay Company together with a number of buildings, machinery, timbers, and a quantity of unsold talc. The reasonable and fair market value of the personalty, exclusive of the timbers and talc, was $7,920. The market value of these items was substantially the same in 1945, the end of the period for which claim is made, and accurately reflects the investment in operating equipment at that time. The 1948 sale price for the leasehold, buildings, machinery, timbers, and talc was $25,000.
Although it urged plaintiff to concentrate on the production of lava talc, the defendant did not prohibit the production of ceramic talc and the plaintiff was free to pursue it to the limit of his resources. The only restriction placed upon plaintiff’s operations by the defendant was the requirement that the money obtained from the RFC because of the strategic character of the steatitic lava be spent for that purpose rather than to develop the ceramic deposits. Otherwise, there was no restriction placed on the ceramic talc production. In this connection, it is interesting to note that during the period of alleged Government direction of the mines toward the production of lava talc, more than five times as much ceramic talc as lava talc was nevertheless produced. There has been no showing made, then, that the United States forced the plaintiff to restrict his production of ceramic talc below any point which he could have attained. As far as the United States was concerned, as long as plaintiff utilized the proceeds of the RFC loan to develop lava talc, he was free to operate in any manner he chose, and in any manner for which he had the resources, in respect to the ceramic talc. Since the United States was not responsible for plaintiff’s inability to develop ceramic talc markets during the years of lava production, we do not see how it can be held accountable for plaintiff’s loss of these supposed markets during the succeeding years.
It is therefore our conclusion that the plaintiff has neither a legal nor an equitable claim against the United States and the House of Representatives, pursuant to Resolution 493, 83rd Congress, 2nd Session, will be so informed. The clerk *93 will certify to the Congress this opinion and the findings which follow.
It is so ordered.
Need, Justice (Bet.), sitting by designation; Laüamoee, Judge; Madden, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Currell Vance, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, Lauren F. Teutsch, came to the State of Montana in 1928. Plaintiff had no education or experience in mining talc. Until 1942, he had been employed as a tool salesman.
2. On July 9, 1941, plaintiff acquired a leasehold interest in the Johnny Gulch Talc Deposits near Ennis, Montana, from the owners, Louis and Maud Clark. He renamed the property the Mountain Talc Mines. In June 1942, he terminated his employment as a tool salesman and devoted his full time to the Mountain Talc Mine.
3. The property which plaintiff had leased as the Mountain Talc Mine was an undeveloped territory showing surface indication of deposits of lava and ceramic talc. Both types of talc were of steatitic grade, a term which had come to mean talc of a quality suitable for use in certain electronic components. In 1942, lava talc was used to manufacture electronics insulators and similar devices. The talc of this grade was relatively expensive to mine, since care had to be taken to maintain the pieces of the talc in a lump suitable for carving. Ceramic talc, on the other hand, was relatively inexpensive to mine since it was ground before use in manufacture, and therefore it could be produced in quantity by the process of sideswiping or blasting to break down the vein to be shoveled into railroad cars.
4. In November 1942 plaintiff brought samples from his talc deposit to Mr. E. W. Newman, District Engineer of the United States Bureau of Mines at Helena, Montana. Mr. Newman sent a bureau engineer to plaintiff’s property to examine the deposit. The bureau engineer obtained samples *94 which the district engineer sent to the American Lava Corporation for evaluation. As a result of a favorable report by the American Lava Corporation, Mr. Newman, before any work was done at the mine, had a preliminary report written up by the engineer who had examined the property. This report was designated War Minerals Report 178. Following the recommendation of the War Minerals Report 178, the Bureau of Mines approved the building of an access road on the property by the United States Forest Service.
5. Following War Minerals Report 178, plaintiff and the Bureau of Mines entered into the following agreement:
This AgeeemeNT entered into this 27 day of October 1948, by the United States of America, Bureau of Mines, party of the first part, hereinafter called the Government, represented by the contracting officer executing this contract, and L. F. Teutsch and Charlotte K. Teutsch, his wife, of Ennis, Madison County, State of Montana, part of the second part.
WitNesseth, that the parties hereto do mutually agree as follows:
1. The party of the second part, being the (lessee) of the following described tracts of land, including mineral rights, in the county of Madison, State of Montana, to-wit, the south half of section 4, T9S RlW, the Homestead and North East Star Placer Claims located in the North half of section 4, T9S RlW and the Little Talc and Hard Rock mining claims located in the NE% of section 8 T9S RlW, containing 680 acres, more or less, hereby grants to the Government the right and privilege to enter upon said, lands and to prospect, drill, bore and explore for minerals in, upon or under said lands, together with the right to maintain thereon all works, buildings, plants, structures, appliances, and equipment necessary or convenient for the prosecution of such prospecting operations.
2. The duly authorized representatives and employees of the Government shall have free access to the said lands for the period of this agreement, including the use of any existing mine workings, it being expressly understood and agreed that the Government shall not be restricted in the choice of drilling locations within the property, or in the conduct of the exploratory operations, so long as such selections or activities do not interfere unreasonably with the use of the surface of the land or with the improvements thereon.
*95 3. The Government shall not be liable for damages on account of such reasonable use of the said lands as may be necessary in the proper conduct of the operations.
4. The party of the second part shall have free access to the said lands and any existing mine workings but, in the discretion of the Government, other persons may be excluded from that portion of the lands on which the Government is conducting operations.
5. The Government shall have the right to remove from the lands samples of ore and rock taken at such points and in such quantities as it may deem desirable for assay or testing purposes.
6. All tools, equipment, structures and improvements placed on or in the property by the Government shall remain the property ox the Government and may be removed by it at any time.
7. Tools, equipment, structures and improvements of the party of the second part on the property at the date of this agreement shall be available for use by the Government in the conduct of the operations without payment therefor.
8. Upon completion of the operations provided for herein, the Government, upon being requested so to do, shall furnish the party of the second part a report of factual data obtained, including any assay plans that have been prepared.
9. The Government shall have the sole right to publication of the results of the operations provided for herein.
10. This agreement shall remain in full force and effect for a period of one year from the date hereof, unless terminated by the Government upon five days’ notice to the party of the second part. The Government shall also have the right to renew this agreement for an additional period of one year.
11. The obligations of this agreement shall extend to and be binding upon, and the benefits hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the parties hereto.
12. It is understood and agreed that the Government is not bound by the terms of this agreement for the expenditure of any amount in excess of available appropriations.
13. No Member of or Delegate to Congress or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise herefrom, but this restriction shall not be construed to extend to this contract if made with a corporation or company for its general benefit.
*96 14. In the event this agreement is executed by a lessee, or other person not the owner of the property ? it will not be binding or effective until the written ratification or consent of the owner has been secured.
CONSENT OE OWNER
_ The undersigned, as owner of the land and mineral rights described in the foregoing agreement, which he
has leased to-, the party of the
second part to said instrument, does hereby consent to the making of said agreement and the terms and provisions thereof, and does hereby join therein.
[S] Louis Clark
[S] Maud Clark
6. The work undertaken by the Bureau of Mines on plaintiff’s property was subsequently described in War Minerals Report 343 of February 1945, excerpts from which are as follows:
A critical shortage of block talc for making insulators for vitally needed radio equipment existed in 1942 and 1943. To help to overcome this shortage, the Bureau of Mines studied many likely areas to find new sources of supply.
The Johnny Gulch talc deposit was first examined in the autumn of 1942, and War Minerals Report 178 was prepared to bring the deposit to the attention of the War agencies. In that report, it was recommended that a shaft be sunk near pit 9 to explore the block-talc deposit at some depth below the outcrops.
Subsequently, at the request of the Army Signal Corps, the Bureau of Mines sank a 50-foot shaft and did other underground exploring on the deposit. This work began in November 1943 and was completed in May 1944.
The deposit was found to occur at relatively shallow depth and to be confined to the deeply weathered side-rite zones. Approximately 200 tons of block talc is indicated in the deposit. As these reserves are close to the surface, they can be mined by open-pit methods, using machinery to strip the overburden and hand methods to recover the talc.
INTRODUCTION
The Johnny Gulch talc deposit was first examined by an engineer of the Bureau of Mines in the fall of 1942. Samples of various exposures of talc were taken and *97 submitted to the American Lava Corporation of Chattanooga, Tenn., for appraisal. This sampling disclosed that lava-grade talc from pit 9 was good enough for use as spacers and insulators in radio tubes. * * *
% sfs
CONCLUSIONS
After having explored the block-talc deposit at the Johnny Gulch talc mine, the Bureau of Mines has concluded that minable block talc is confined to an approximately horizontal zone extending about 45 feet below the surface, and that the zones of greatest weathering are more likely to yield high-grade block talc.
As mining talc in sight appears to be the logical procedure to explore the area further, no further exploration is recommended by the Bureau of Mines. It is suggested that open-pit methods be used to mine the block talc in order to speed up production and make a maximum recovery.
7. On January 15,1943, the Board of Directors of the Reconstruction Finance Corporation authorized a loan to plaintiff of $7,500 by the following instrument:
Whereas, steatitic talc is a strategic and critical mineral of value to the United States m time of war, and there is sufficient reason to believe that through use of a loan of $7,500 there will be developed a sufficient quantity of such ore to pay a profit upon mining operations;
Now, TheReeore, Be it Resolved, That Reconstruction Finance Corporation (RFC) authorizes a loan of not to exceed $7,500 to L. F. Teutsch, Box 52, Ennis, Montana (Borrower), under Section 5d of the Reconstruction Finance Corporation Act, as amended, to assist Borrower to further develop a steatitic talc deposit in Madison County, Montana.
Borrower shall deliver to RFC, approved as to form and substance by Counsel for RFC, the following:
1. Two promissory notes, one in the amount of $5,000, due January 1, 1944, and one in the amount of $2,500, due July 1,1944, bearing interest at 4%.
2. Lien, assignment, and deposit agreement, to secure payment and mortgage of equipment.
3. Agreement executed by Borrower to provide that Borrower will not lease, encumber or transfer the mining property, rights, or equipment without prior written consent of the Chief or Acting Chief, Self-Liquidating Division of RFC (Division Chief), will not incur any *98 obligation in connection with. the. property or its development or operation, or pay any wage or salary of more than $2,400 a year, without prior written consent of Division Chief, and to provide for inspection, supervision and control by EFC.
4. Evidence of ownership of the mining property or rights, list of creditors and such standby and subordination agreements as Division Chief shall require, detailed requisitions and accountings for loan and operating funds, and such other documents, and assurances as Division Chief and Counsel from time to time may require.
No disbursement shall be made beyond an amount approved by Division Chief as necessary, nor after one year from this date, and no disbursement or deposit withdrawals shall be made without approval of Division Chief or a duly authorized representative of EFC, nor if Division Chief or Counsel for EFC are at any time dissatisfied with any phase of the transaction, unless correction to their satisfaction is made within the time granted.
The Treasurer of EFC is directed to accept the notes and disburse the loan and to execute any and all agreements and documents in connection with the loan and the operations, in accordance herewith, upon approval of the Division Chief and Counsel. The Secretary or an Assistant Secretary of EFC is directed to forward a certified copy of this Eesolution to Borrower.
# sj« si*
The foregoing Eesolution was duly adopted by the Board of Directors of Eeconstruction Finance Corporation on the 15th day of January 1943.
[sQ F. T. Holm, Secretary, Reconstruction, Finance Corporation.
8. On February 27, 1943, plaintiff executed 2 promissory notes in the amounts of $5,000 and $2,500, due January 1, 1944 and July 1,1944, respectively, to secure payment of the money loaned him by the EFC.
9. The Eeconstruction Finance Corporation and the War Production Board were interested in plaintiff’s mine as a source of block or lava talc. As stated above, this material was used to make insulators for radar and other electrical devices much in demand during the war. Such talc had been imported chiefly from Italy and India before the war, but these sources were no longer available. Plaintiff’s block talc *99 was the most suitable found in this country and was in high demand.
10. This situation influenced the defendant in advancing to plaintiff the funds to develop the mine and increase its production of block talc. By the same token, it actuated and enabled the officials of RFC and War Production Board, and other interested agencies of the defendant, to urge the plaintiff to devote his chief efforts to the production of block talc.
11. While the Bureau of Mines personnel were carrying out the exploratory work described in War Minerals Report 343, the District Engineer attempted to assist plaintiff in the marketing of his ceramic talc. In addition, he authorized the Government engineer, Mr. Donald Hoikvam, to answer Mr. Teutsch’s requests for technical advice. At Mr. Teutsch’s request, Mr. Hoikvam allowed an experienced miner, Mr. Carl Dixon, who was working for the Bureau of Mines project, to assist plaintiff, as his foreman, in mining ceramic talc. However, the suggestions of the experienced personnel at the site were not always accepted by plaintiff, with the result that the ceramic talc ore extracted was sometimes mixed with low grade talc, waste and other impurities. Talc containing any substantial amount of foreign bodies would be rejected by prospective purchasers.
12. The mining and marketing of talc is a very technical and complicated business requiring experience and know-how not only in mining, but in research and business administration as well. Individual customers must be convinced that a specific quality of talc can be delivered which will meet their peculiar needs. The marketing of this ore, unlike that of some metallic ores which can be sold directly to smelters, requires an intensive kind of selling. Mr. Teutsch’s mine was not developed or equipped to produce lava or ceramic talc with the efficiency required to compete in the commercial world, since it was not much more than a prospect which would have required extensive and expensive additions and development, including a grinding mill, to make it a commercially profitable enterprise. Plaintiff had no substantial ceramic talc markets when he commenced his operations in lava talc and he lacked the mining experience and material resources to develop them thereafter.
*100 13. On December 30, 1948, plaintiff assigned and sold his leasehold interest in the mine property to the Sierra Talc and Clay Company of Los Angeles, California for $15,000. As a part of the same transaction he likewise conveyed all the personalty, including 5 cabins, machinery, timber and two carloads of talc, remaining at the mine to the same company for $10,000. The fair and reasonable value of the personalty excluding the talc and the timber was $7,920. There had been no variation in the market value of such equipment between 1945 and the date of the sale in 1948.
14. As stated above, the mining of block talc is a slow and expensive process. This material does not occur in large strata, but in isolated lenses. It is very fragile when first exposed to the air and must be removed by hand to prevent its shattering, since it is used in blocks. The mining of block talc is not profitable and the RFC recognized that plaintiff sustained a loss on the amount of block talc he produced.
15. Ceramic talc, on the other hand, can be mined in bulk by blasting and with the use of machines. The production of this type of talc was the profitable part of plaintiff’s mining venture. Plaintiff’s limited financial resources and the limitations on the wartime manpower supply prevented plaintiff from expanding his ceramic talc operations. During this period the defendant insisted that the proceeds of the RFC loan be devoted to the production of the strategic lava talc.
16. In order to effect a settlement under the Contract Settlement Act of 1944, it was considered by the parties that plaintiff’s operations had been under Government control or at its instance, from March of 1943 to November 1945. During this time plaintiff produced 528,868 pounds of block talc and about 2,925,000 pounds of ceramic talc.
17. Plaintiff ceased his mining operation in 1945 when the need for block talc was no longer felt. On September 21, 1946, he submitted a claim to the RFC for losses on the mine operation and loss of the alleged profit that he theoretically would have realized had he continued to mine ceramic talc for 3 years after 1945.
The total of plaintiff’s claim was $55,932.37, itemized as follows:
*101 (1) Loss on mining of lava talc-$26,452.91
(2) Profit on mining of lava talc claimed_ 14,882. 00
(3) Loss of profits on ceramic tale for years after 1945 attributed by plaintiff to concentration on mining of lava talc sold at tbe direction of tbe Government_ 10, 026. 00
(4) Expenses since December 31,1945, incurred in mitigation of costs and also resulting from failure of Government to make prompt settlement_ 5,297. 46
(5) Settlement expenses_ 274. 00 Services of Newland & Blinn in connection witb preparation of claim to September 16, 1946, inclusive.
Total claim_$55,932.37
18. Items 2 and 3 of said claim are involved in the instant case. As to item 2, this amount is arrived at as follows: plaintiff’s average sale price per ton of ceramic talc was $19.50, of which $4.07 represented profit above the estimated cost of producing per ton of $15.43. Based on estimates of possible ceramic talc production, the plaintiff believes he could have realized a 26 percent profit margin. Applying this percentage to the cost incurred in producing block talc, or $57,038.47, plaintiff arrived at the claimed profit of $14,882 which might have resulted by the expenditure for ceramic talc of the amount actually expended in the production of block talc.
19. Item 3 is arrived at by claiming an estimated production of 600 tons per year of ceramic talc for a period of 3 years at a profit of $4.07 per ton, plus plaintiff’s salary figured at $1.50 per ton, or a total of $5.57 per ton.
20. On July 24, 1947, a final settlement agreement was executed between plaintiff and the RFC, as follows:
This SettlemeNT Ageeemeht, entered into pursuant to the Contract Settlement Act of 1944 (hereinafter called “the Act”), as of this 24th day of July, 1947 by Reconstruction Finance Corporation (hereinafter called “RFC”) on its own behalf and as successor to Metals Reserve Company (hereinafter called “MRC”) and L. F. Teutsch (hereinafter called “the Contractor”);
WITNESSETH THAT!
WheReas, the Contractor during World War II mined talc on property situated in the County of Madison, State of Montana; and
*102 Whereas, talc is a material which, was related to the prosecution of the war; and
Whereas, the Contractor asserted a claim against BFC and MBC under Section 17(a) of the Act for fair compensation for furnishing or arranging to furnish talc to MBC or to war contractors, without a formal contract, but relying in good faith upon oral and written instructions of agents of BFC; and
Whereas, the Act declares that it shall be the responsibility of the contracting agency to investigate claims under Section 17 (a) of the Act, and that if the facts justify the grant or relief within the authority of the Act, the war contractor shall be provided with speedy and fair compensation therefor, and that the contracting agency may settle all or any part of a claim by with the war and
Whereas, BFC has determined that the Contractor is entitled to fair on the claim: and
Whereas, the Contractor is indebted to BFC on a loan secured from BFC to assist him in the development and mining of talc, and the Contractor agrees to discharge said indebtedness as of this
Now, Therefore, the parties hereto do mutually agree as follows:
Article 1. BFC as part of this negotiated settlement, hereby confirms and acknowledges the right of the Contractor to retain all machinery, equipment and supplies purchased or acquired by the Contractor with the proceeds of BFC’s loan to the Contractor.
Article 2. BFC further 'agrees that it will direct the First National Bank of Butte, Montana to disburse to the Contractor the balance of the loan account designated as “L. F. Teutsch — BFC account” and it will deliver to the Contractor a release and satisf action of the mortgage BFC holds upon certain machinery and equipment of the Contractor and that it will duly endorse the Contractor’s notes as having been paid in full and deliver same to him.
Article 3. The Contractor hereby transfers and conveys to BFC, with the right to immediate possession, title to the talc inventory now stored with Welles Lumber Company, Norris, Montana and described in the inventory schedule submitted by the Contractor in connection with his claim. The Contractor warrants the title of said talc to be free and clear of all liens and encumbrances except for a lien that may arise from the Contractor’s indebtedness to Welles Lumber Company for trucking, loading, and storage thereof, and which *103 indebtedness RFC, as part of this Agreement agrees to discharge.
Article A Upon execution of this Agreement, RFC agrees to pay to the Contractor or his assignee, upon presentation of a properly certified voucher, the sum of $17,550.04 representing the sum of $24,325.00 less $6,774.96 representing the unpaid principal of the Contractor’s loan from RFC together with all accrued interest thereon to and including July 21, 1947. Said sum constitutes payment in full and complete settlement of the amount due the Contractor from RFC and MRC and all other claims of the Contractor under the Act.
Upon payment of said sum of $17,550.04, as aforesaid, all rights and liabilities of the parties under the Act shall cease forthwith and be forever released, and it is expressly understood that this Agreement shall inure to the benefit of the United States Government and any and all of its agencies and instrumentalities.
In WitNess Whereof, the parties hereto have caused this Agreement to be executed in duplicate as of the date first above written.
21. It was agreed that plaintiff’s production of block or lava talc during the period of control assumed for the purposes of the settlement had been conducted at a loss of approximately the sum claimed. Defendant’s officials felt that they had authority to pay plaintiff this loss. However, they did not feel that they had authority to pay for loss of profits on the lost production of ceramic talc, either past or prospective, and they so informed the plaintiff. It is for such profits plaintiff claims in this suit.
22. As stated above plaintiff’s claim under item 2 was for the loss sustained by not devoting to the production of ceramic talc the amount expended during the period of control in producing block talc.
Under item 3 of the claim plaintiff said that by the time controls were removed he had lost his clientele for the production and sale of ceramic talc, and that had he not been under control he would have maintained his market to the extent that he could have produced and sold for at least 3 years after controls were lifted 600 tons per year of ceramic talc.
23. Without the assistance derived from defendant’s loan of $7,500 to him, plaintiff could not have operated as efficiently, and on the same scale, as he did.