Collins, Judge,
delivered the opinion of the court:
This congressional reference case[1] was filed pursuant to H. Ees. 249, 87th Cong., 1st Sess., passed by the House of Eep-resentatives on July 10,1961. That resolution directed this court to report to Congress regarding the nature of a claim presented by the estate of George S. Eumley, and the amount, *102 if any, legally or equitably due from the United States.[2] The word “plaintiff” hereinafter refers to George S. Bumley.[3]
The plaintiff and the defendant were parties to three separate contracts. Plaintiff asserts a valid claim founded upon one contract and the defendant admits the amount involved in this claim was withheld from the payment due plaintiff under that contract. Defendant refused to pay plaintiff its money because of counterclaims arising from the other two contracts. Previously, in an action brought under 28 U.S.C. § 1491, this court determined that neither plaintiff nor defendant was entitled to a net judgment. Rumley v. United States, 152 Ct. Cl. 166, 285 F. 2d 773 (1961). In the present case, plaintiff seeks to establish an equitable claim “in a broad non-juridical sense.” The court is now requested to determine and to advise the Congress, in light of this broad concept of “equity,” whether the counterclaims of the Government should prevent recovery by plaintiff.
The findings of fact by Commissioner Paul H. McMurray have been adopted, with modifications, by the court and are incorporated within this opinion. A brief statement of the facts follows:
Plaintiff herein claims he is entitled to $12,840, which is admittedly due for work on contract DA-30-280-QM-12130 (hereinafter referred to as QM-12130). The defendant has withheld and has refused payment under said contract because of its counterclaims arising under contract DA-30-280-QM-3833 (hereinafter referred to as QM-3833) and contract DA-30-352-TAP-1904 (hereinafter referred to as TAP-1904). This court, in its prior decision, established plaintiff’s claim in the amount of $12,840 under QM-12130 and the counterclaim of the defendant, under QM-3833, in the amount of $27,930. Begarding defendant’s counterclaim *103 based upon TAP-1904, in the amount of $1,143.19, plaintiff had admitted his liability. In view of the insolvency of the plaintiff at that time and his inability to satisfy any judgment, the defendant requested judgment on its counterclaims only to the extent required to offset plaintiff’s judgment in the amount of $12,840. The court, believing this to be reasonable and that such would “result in substantial justice to both parties,” ordered such an offset.
It was apparent at that time, as it is now, that the plaintiff had “no legal or equitable claim against the United States, in the sense of a claim enforceable in a court, under applicable legal standards.” Palmer-Bee Co. v. United States, 142 Ct. Cl. 485, 488 (1958).
Contract QM-3833 related to the manufacture of dufflebags. Plaintiff’s bid of 47 cents per unit was the lowest of 62 bids submitted. On June 12,1950, in response to an addendum to the invitation for bids, requiring packaging for overseas shipment instead of for domestic shipment, plaintiff failed to enclose a suggested alteration of his bid. On June 16,1950, defendant determined to award the contract to plaintiff. On June 17, 1950, prior to receiving notice of the award, plaintiff wrote to defendant advising that plaintiff’s bid had been based on errors in calculating costs and, at that time, plaintiff requested a necessary change upward in its bid price. Plaintiff’s letter expressed various notions regarding acceptance of the contract. First, plaintiff stated that he would take the contract, except for deliveries to four of the locations, if the price were increased by three-fourths of a cent. The plaintiff added that if the unit price were raised by 1 y2 cents, he would accept the entire contract although, because of expected losses confronting him, he suggested that part or all of the contract go to the Brown Manufacturing Company.
In June and July 1950, during conferences between the plaintiff and the contracting officer, plaintiff explained the various errors he had made in his calculations and requested that the unit price be raised to 54 cents per unit.[4] On *104 August 11, 1950, plaintiff asked to be relieved from the contract on the ground of his inability to perform except at a substantial loss to himself and to his business.
On September 7,1950, the successor contracting officer recommended that the plaintiff be relieved of his obligations.[5] His report recognized that plaintiff’s bid was “unusually low” and stated that the more normal range of bid prices would be 58 cents per unit and up. The report pointed out that the Philadelphia Quartermaster Depot’s Manufacturing Division had estimated, in June 1950, that “the labor and material costs for this item [would] be $.7033,” not including transportation and overhead costs, but the contracting officer added that “Government manufacturing costs may be as much as 25% or 30% higher than costs incurred by commercial firms.”[6]
On November 8, 1950, the Comptroller General ruled that he had no legal basis for increasing the price of contract QM-3833 and no legal basis for relieving plaintiff from his liability under the terms of the contract.[7] In the face of increasing prices, due to the Korean situation, plaintiff finally wrote the contracting officer on December 28, 1950, requesting the Government to cancel the contract. The contracting officer replied that unless the plaintiff, by January 15, 1951, could give assurance of his performance, the contract would be terminated for default. By letter of January 17, 1951, plaintiff was notified that the contract was terminated and that the Government reserved its rights, including the right of repurchase. Plaintiff appealed the termination to the Armed Services Board of Contract Appeals.[8]
The defendant did not enter into new contracts for the purchase of the dufflebags until June 1,1951. In September 1951, the contracting officer submitted to plaintiff a claim for $66,121.60, based on the difference between the contract price under QM-3833 and the actual cost under the new contracts for purchase. Plaintiff also appealed from this determination to the ASBCA. Subsequently, the Government’s claim *105 was amended to $29,670.07, an amount which, in the opinion of the contracting officer, represented the excess which would have resulted had defendant made the new contracts for purchase and manufacture of the dufflebags within a reasonable time. By its opinion of September 12, 1952, the Armed Services Board of Contract Appeals (1) sustained the termination of the contract, but (2) rejected the assessment of excess costs since (a) the actual repurchase was made too late and (b) the amended claim was not made pursuant to the contract.[9]
Contract TAP-1904 was awarded to plaintiff on May 26, 1953. Pursuant to its terms, the Government shipped certain material to plaintiff on June 17, 1953. At the time of both the award and the shipment, plaintiff was ill and hospitalized. On August 5,1953, due to plaintiff’s inability to continue performance, the parties mutually agreed to terminate this contract, the Government reserving its rights. Defendant’s' counterclaim was for $1,143.19, the cost of shipping and handling the material.[10]
At the time of the hearing in the prior case,[11] plaintiff admitted his liability for the Government’s counterclaim based on contract TAP-1904.[12]
The term “equitable claim,” in the context of congressional reference, “is not used in a strict technical sense meaning a claim * * * [cognizable] by courts of equity, but [is used in] the broader moral sense based upon general equitable considerations.” Burkhardt v. United States, 113 Ct. Cl. 658, 667, 84 F. Supp. 553 (1949). The issue in the present case is whether or not plaintiff has such an “equitable claim.” According to plaintiff, defendant’s counterclaims are “in *106 equitable”- and should not bar plaintiff’s recovery of the $12,840 withheld from the payment for contract. QM-12130.
Plaintiff’s contention that the counterclaim, based upon contract QM-3833 is “inequitable” is based in part upon the successor contracting officer’s recommendation that plaintiff be relieved of the contract. Unquestionably,, the primary bases of his recommendation were, the facts that plaintiff’s bid was “unusually low” and that performance would result in a substantial loss to plaintiff.[13] In the action brought under 28 U.S.C. § 1941,[14] this court determined that Rumley’s unilateral mistake, although honestly made, was not so demonstrably gross that the acceptance of his bid was unconscionable. The lowness of plaintiff’s bid did not prevent the formation of a legally binding contract. However, this fact is not determinative of the issue presently before the court and the Congress. The very significance of the concept of “equity” as described in Burkhardt v. United States, supra, is that it permits the court to go beyond the rules of law. Thus, applying “equity” in this broad sense, we consider the extreme lowness of plaintiff’s bid to be one factor which supports the contention that the counterclaim based on contract QM-3833 is “inequitable.” Of further importance in reaching this conclusion is the following statement in the recommendations of the successor contracting officer: “Almost immediately after * * * [the Government had awarded the contract], the contractor brought to the attention of the contracting officer the facts to show that the unit price of $.47 was totally inadequate.” (Emphasis supplied.) In view of these findings, which are supported by substantial evidence, we feel that the successor contracting officer had ample justi *107 fication for recommending that plaintiff be relieved of the contract.
Furthermore, from the standpoint of “equity” in the broad moral sense, this court is of the opinion that plaintiff should have been freed of his obligation under contract QM-3833, because of the lowness of plaintiff’s bid and the prompt notice plaintiff gave defendant, both before and after he learned of the awarding of the contract to him. This contract, like contract TAP-1904, could have been terminated by mutual agreement, as recommended by the contracting officer. Hindsight plainly shows that such a course would have obviated later losses and would have inured to the benefit of both parties. In short, while the plaintiff had no legal right to have the contract rescinded, the circumstances of this case are such that it would be “inequitable” to allow the counterclaim, based upon contract QM-3833 to prevent plaintiff from recovering the $12,840 due to him on contract QM-12130.
Another assertion made by plaintiff is that his inability to perform was caused in part by price increases which occurred during the Korean war. While, as indicated above, we find other factors sufficient to establish the “equitable” position of plaintiff, it is noteworthy that considerable time elapsed between the date of plaintiff’s requests for relief and November 30,1950, when plaintiff was informed of the Comptroller General’s ruling. As indicated in plaintiff’s letter of December 28, 1950, the belated decision on his requests for relief increased his difficulties.[15]
This court does not accept the argument of plaintiff that, since the repurchase by defendant did not take place within a reasonable time, it would be “inequitable” to charge him with defendant’s (QM-3833) counterclaim. The counterclaim did not rest upon the (admittedly tardy) actual repurchase price. In the prior suit, 152 Ct. Cl. 166, 172, defendant’s judgment was based upon what the cost of repurchase would have been if repurchase had been made within a reasonable time. This matter does not, however, affect our view here regarding the “equitable” claim of plaintiff.
*108 According to defendant, one seeking to establish, an equitable claim in the broad moral sense must show some fault or wrongdoing on the part of the Government. The facts of Ottinger Brothers v. United States, 157 Ct. Cl. 12, 301 F. 2d 336 (1962), and the other cases[16] cited by defendant bear scant resemblance to those of the instant case. Defendant’s authorities do not compel the conclusion that plaintiff is without an “equitable claim.” It is correct that plaintiff’s errors were not attributable to any action of the Government; nevertheless, as indicated above, this court feels that the circumstances of this case are sufficient to establish plaintiff’s “equitable” position under the concept set forth in the Burkhardt case, supra.
Further mention should be given to the result reached in the prior action between plaintiff and defendant. Regarding the counterclaim based on contract Q,M-3833, this court found that defendant was entitled to $27,930; however, since we granted defendant’s request that it recover only to the extent required to offset any judgment awarded plaintiff, we held that each party was entitled to $12,840. 152 Ct. Cl. 166, 173. As stated above, the motivation for defendant’s request was the fact that plaintiff was insolvent. In view of the fact that this court found that defendant’s request would “result in substantial justice to both parties,” defendant now asserts that the matter of plaintiff’s “equitable” entitlement is res judicata. Defendant’s argument' is erroneous for, in the action based upon 28 U.S.C. § 1491, the question of an equitable claim in the broad non juridical sense was not and could not have been before the court.[17] Although the doctrine of res judicata is not applicable, consideration should be given to the relation between the reduction of defendant’s judgment and plaintiff’s present “equitable” claim. For example, one could assume that plaintiff received “equity” when the judgment of defendant was reduced to $12,840. The difficulty with this notion is that it starts with the assumption that defendant had an “equitable” as well as a legal right to *109 a judgment for $27,930. In this congressional reference case, we have looked beyond our prior legal determination that plaintiff breached the contract and have now concluded that, from the standpoint of “equity” in the broad sense, plaintiff should have been relieved of the contract prior to the occurrence of the breach. Thus, in terms of “equity,” defendant was not entitled to $27,930 or to any other amount on the basis of contract QM-3833. Our position, therefore, is that defendant’s agreement to reduce its judgment to $12,840 has no effect upon the “equitable” claim of plaintiff.
Different considerations apply to the counterclaim relative to contract TAP-1904. In the prior suit, 152 Ct. Cl. 166, footnotes on pp. 167,189, plaintiff had admitted that it owed the $1,143.19 which defendant claimed on the basis of contract TAP-1904. Plaintiff now asserts that it would be unreasonable to hold him liable for this counterclaim. As a result of the request of plaintiff, who was hospitalized and unable to perform, the contract was terminated by mutual agreement.[18] No repurchase was to be made, but the Government did reserve its other rights. The expenses which the Government sought to recover were incurred pursuant to the contract. In view of these facts and especially of the prior admission by plaintiff, it would be neither “unreasonable” nor “inequitable” to charge plaintiff with this counterclaim.
Therefore, this court is of the opinion that while plaintiff has no claim cognizable by a court of law or equity, he does have an “equitable” claim in the nonjuridical sense and that the amount of the claim is $11,667.06.[19] This opinion and the findings of fact incorporated herein will be certified by the Clerk to the House of Pepresentatives, pursuant to House Eesolution 249, 87th Congress, 1st Session.
*110 FINDINGS OF FACT
Tlie court, having considered the evidence, the report of Trial Commissioner Paul H. McMürray, and the briefs and arguments of counsel, makes findings of fact as follows:
1. Josephine C. Rumley, the widow of George S. Rumley who died July 11, 1960, intestate, resides at 15 Holyoke Street, Lynn, Massachusetts. On October 4, 1960, in Probate Court held at Salem, Essex County, Massachusetts, Docket No. 62270, plaintiff was appointed administratrix of the estate of George S. Rumley, deceased. Throughout these findings the term “plaintiff” - ref ers to decedent George S. Rumley, who filed the initial claim in this action.[20]
2. This claim was first presented to the court by petition filed July 3, 1956, as George S. Rumley, d.b.a. George S. Rumley Shoe Mfg. Co. v. The United States, No. 286-56. A trial was held and a report filed by the commissioner on October 29,1959. The matter was disposed of by an opinion of this court dated January 18,1961, on a legal basis, whereas the congressional reference now requires that the same claim be reviewed in the light of the matters referred to in H.R. 6012 and H. Rept. 502, 87th Cong., 1st Sess.
3. Plaintiff’s most récent petition was filed pursuant to H. Res. 249, 87th Cong., 1st Sess., which reads as follows:
Resolved, That the bill (H.R. 6012) entitled “A bill for the relief of the. estate of George S. Rumley,” together with all accompanying papers, is hereby referred to the Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and the court shall proceed expeditiously with the same and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform Congress whether the claim is a legal or equitable claim or a gratuity, and the amount of damages, if any, legally or equitably due from the United States to the claimant, the statute of limitations, the plea or res judicata, laches, any lapse of time, or any prior court *111 decision of this claim by any court of the United States to the contrary, notwithstanding. The Court of Claims is directed to consider the records of any previous trial of this case.
H. Kept. 502,87th Cong., 1st Sess., accompanying H. Res. 249, states, at pages 2 and 3, as follows:
_ The claimant contends that only through a congressional reference will the Court of Claims be empowered to consider principles of equity and conscience in the broad and moral sense; that such principles are present in her favor; and, they could not be brought out in the original trial due to the nature of the case and restrictions of the type and kind of evidence admissible in that trial.
Consideration in the scope of broad moral principles is sought oh the effect of the report óf a contracting officer to the Quartermaster General that Mr. Rumley be relieved of the Air Force duffelbag contract; the price spiral induced by the Korean war; and, the repurchase by the contracting officer of the duffelbags from other contractors at prices asserted to be excessive and charged to Mr. Rumley as well as the timeliness of said repurchase.
_ The committee carefully considered this matter in the light of the claimant’s contentions and with equal concern for the Government’s rights and interests in the judgment recovered by the Government against the claimant. The committee concluded that the issues raised are of such adversary nature that the matter, without waiving consideration of the rights of the Government in and to the judgment it recovered against the claimant or its use in setoff, counterclaim, or other defense, and expressly reserving for the court’s consideration all the facts giving rise thereto, should be referred to the Court of Claims under the procedures for congressional reference cases as contained in sections 1492 and 2509 of title 28 of the United States Code. Accordingly, the committee recommends that House Resolution 249 be considered favorably.
4. Plaintiff insists there is due and owing to plaintiff $12,840 on contract No. DA-30-280-QM-12130. Defendant has refused to pay that amount to plaintiff because of counterclaims which have been asserted against plaintiff by defendant under contracts DA-30-280-QM-3833 and DA-30-352-TAP-1904.
*112 Contract QM-3833
5. Contract QM-3833 related to the manufacture of duffle-bags, and plaintiff, on May 24, 1950, submitted his bid of $0.47 per unit. On June 16, 1950, it was decided to award the contract to plaintiff and a contract, dated June 17, 1950, was mailed to him. On June 17, 1950, prior to receiving notice of the award, plaintiff wrote the Government that his bid was low because of errors; plaintiff’s letter expressed various notions regarding acceptance of the contract. First, plaintiff stated that he would take the contract, except for deliveries to four of the locations, if the price were increased by three-fourths of a cent. Then plaintiff added that if the unit price were raised by 1% cents, he would accept the entire contract, although, because of expected losses confronting him, he suggested that part or all of the contract go to Brown Manufacturing Company.
On June 20, 1950, and thereafter, plaintiff conferred with the contracting officer in New York and explained his financial position and the errors that he had made in arriving at his bid price. On September 7,1950, the-contracting officer submitted a report to the Quartermaster General as follows:
1. This report is forwarded pursuant to QMC Procurement Instructions, 3-112.2 and JPB 3-115 and ASPE 2-405 therein cited.
2. The George S. Burnley Shoe Mfg. Co. of 113 Market Street, Lynn, Massachusetts, was awarded Contract DA 30-280-qm-3833 on 16 June 1950 for the furnishing and delivery, f.o.b. destination, of 190,000 bags, duffle, to ten different destinations at uniform unit prices of $.47 to all destinations. The award was made after formal advertisement and upon contractor’s written bid submitted in response to Invitation for Bids QM 30-280-50-854. Under the contract, deliveries are required monthly commencing November 1950 and running through December 1951.
3. Bids under Invitation QM 30-280-50-854 were received from 62 firms. George S. Burnley Shoe Mfg. Co. was low as to all destinations with the exception of bidder #50, E. A. Brown Mfg. Co. of Dodge City, Kansas, who submitted a lower price, i.e., $.4688 on deliveries to Fort Worth, Texas. However, with the cost *113 of .transportation of Government Furnished Property to E. A. Brown considered, said firm was not the low bidder. Except for the prices 'bid by E. A. Brown Mfg. Co., all other bidders submitted unit prices substantially higher than the $.47 bid by- subject contractor, some firms bidding over $2.00 per unit (see abstract of bids, Inc. #3).
4. On 8 May 1950 the Government issued Addendum #1 to Invitation for Bids QM 30-280-50-854 changing the packing from “to be packed for domestic shipment” to “to be packed for overseas shipment”. The contractor signed and returned this Addendum under date June 12, 1950 with no change in price.
5. In a letter dated 17 June 1950 (Inch #1(1)) the day after the award of subject contract, contractor wrote to this office alleging that in sending in Addendum #1, the cost of overseas packing of % of a cent per bag should have been added to the bid price. The contractor then alleged that it failed to take into consideration the weight of the duffle bag when placing its bid. Consideration of the exact weight of the duffle bag is important in computing freight costs. The contractor concluded that if the Government increased the bid price by iy2$ the contractor would accept and complete the the contract even though it would make no money on the deal. However, contractor stated that it desired that the Government give the entire contract to someone else since completion of the contract would mean loss of “around three or four thousand dollars on this deal”. It appears from contractor’s further letter of July 17, 1950 that its request of June 17, 1950 was mailed prior to receipt of the award of subject contract.
6. Conferences were held with the contracting officer in an attempt to adjust this matter and under date July 17, 1950 (Inch #1(2)) the contractor submitted further evidence of mistake m bid through errors in ascertainment of costs and elements thereof.
7. The substance of the contractor’s allegation is as follows:
a. A whole year’s work on subject contract would result in a loss of $10,000.
b. This was a new item for contractor and it made an erroneous guess as to the weight of the duffle bag.
c. The contractor estimated two cents per bag for reinforcements at the bottom and now finds after experimentation that the cost would be five cents per bag.
*114 d. The contractor will be required to purchase an additional “off-the-arm closing machine” because the machines it now has are not big enough.
e. It now appears that labor costs will be twenty-three cents per bag whereas contractor originally estimated 20%$ per bag.
f. The contractor forgot to include a charge of 20$ on every $100 worth of insurance on certain shipments, which resulted in an added cost of $275.20.
g. As a result of the foregoing, contractor requested that a fair and equitable adjustment in price be made so that the price per unit be brought up to $.54 per bag which is still under any other bidder with the exception of E. A. Brown Mfg. Co. _
_ 8. Subject contractor included with its letter of 17 July 1950 what purports to be its original working figures compared with actual costs as ascertained together with supporting letters of cost from various suppliers. Contractor followed its letter of 17 July 1950 with another letter of 24 July 1950 inclosing as sheet #1, Original Working Figures on Duffle Bags Before Placing Bid (predicated on 250,000 units) and as sheet #2, Actual Costs (also predicated on 250,000 units). Contractor again requested that the price be increased to $.54.
9. Further conferences were had and in a visit to this office on or about 11 August 1950 contractor requested relief from its contractual obligation on the ground that it could perform the contract only at a loss.
10. With specific reference to the mistake in computing the freight charges there is inclosed as exhibit #4, a computation made by the Cost & Price Analysis Section of this office showing that contractor erred in its freight charges to the extent of $5,956.12.
11. From review of the contractor’s figures it would appear that his operations on subject contract would be at a loss to the contractor. Furthermore, from a review of the abstract of bids it appears that subject contractor’s bid was unusually low.
12. A balance sheet from the George S. Kumley Shoe Mfg. Co. as of 30 April 1950 shows current assets as follows:
Cash in bank_$8,754.00
Inventory_36, 018. 35
Fixed Assets and equipment — machinery_11,212. 81
For a total of. 35,985.16
*115 No liabilities are shown, leaving a net total of $35,985.16.
13. A letter from the Security Trust Company of Lynn, Massachusetts, dated 5 June 1950 reveals that subject contractor has maintained satisfactory balances with that institution since December 1947; that while subject contractor was processing Government orders during 1949 the bank granted him a high line of credit of $18,000.00 and secured an assignment of the contract winch was paid in full as agreed. Further, the bank loaned George S. Rumley Shoe Mfg. Co. $10,000 on a first mortgage on his home property, which has been reduced to $100.00.
14. It would appear, therefore, that subject contractor, while in good standing financially and maintaining good credit relations with its bank, is not a large company and would suffer to a substantial degree were it forced to take a loss of $10,000.
15. The Government received 62 bids on its invitation for subject item and in the highly competitive market which then existed the contracting officer could not unequivocally know that the bid prices of the George S. Rumley Shoe Mfg. Co. and bidder #50, E. A. Brown Mfg. Co. were so much out of line as to make it unconscionable that such bids be accepted. Almost immediately after making the award, the contractor brought to the attention of the contracting officer the facts to show that the unit price of $.47 was totally inadequate. The substantially higher prices bid by the remaining 60 bidders indicate that the more normal price range was $.58 and up. Figures as of June 1950 from the Philadelphia Quartermaster Depot’s Manufacturing Division showed the labor and material costs for this item to be $.7033. It is known, however, that Government manufacturing costs may be as much as 25% or 30% higher than costs incurred by commercial firms.
16. It is the carefully considered opinion of the Successor Contracting Officer that under all the facts and circumstances, the Government should allow the contractor to be relieved of its obligation under Contract DA 30-280-qm-3833.
The facts, so reported by the contracting officer as a basis for his recommendation, are found to have been correct and supported by substantial evidence.
6. Thereafter, on November 8,1950, the Comptroller General ruled that he had no legal basis for increasing the price of contract QM-3833 and no legal basis to relieve plaintiff *116 from his liabilities under the terms of the contract. By letter dated November SO, 1950, the contracting officer advised plaintiff of the decision of the Comptroller General. By that time plaintiff’s commitments for materials had been can-celled because of price increases which occurred during or as a result of the Korean war. For example, the record shows that the price of a snap fastener and keeper, necessary to the manufacture of the dufflebags, first quoted at 9 cents a set, was later increased to 12% cents. The total increase of the cost to the contractor of these components furnished by him at the increased price would have amounted to approximately $11,875.
At such time plaintiff was not able to perform the contract without great financial loss because of the errors in his original bid price and the price increases which occurred during the Korean war. Under date of December 28, 1950, plaintiff wrote to the New York Quartermaster Procurement Agency in part as follows:
Under the terms of the contract covering the manufacture of Duffel Bags, the government was required to furnish the material and up to and beyond the date that I was required to make my first delivery of Duffel Bags, I did not receive the material nor have I ever received it up to the date of this writing. In view of the fact that the Government failed to live up to its obligation under the contract the breach of contract was caused by the government and I was placed in a position where I was unable to perform my obligation. It appears elementary to me therefore that no responsibility rests upon me under the contract where the breach was caused by the government. Without waiving my rights set out above many other factors have now entered into the case, such as, all my commitments for materials which I was to furnish under the terms of the contract have been can-celled, which means another loss of $11875.00 on this contract.
In other words, to make myself clear, North & Judd gave me a price of $.09 on the snap fastener and keeper and they are now seEing at $.1275 and on this one item alone you can plainly see that I would have a loss of $.03% on each Duffel Bag and with the added costs of grommets and baling it would entail the figure of $11875.00 as stated above. This was entirely due to the belated decision on my request of $.07 extra per bag or *117 relief from contract. This request was made July 17, 1950 and I never received an answer until I received your letter dated Nov. 30,1950.
The bank I do business with refuses to go along with me now and consequently I believe in view of the above facts if I were to attempt to perform this contract now it would work unnecessary hardship on me and no doubt I would be unable to finish it and as a result I would be driven out of business.
I therefore request cancellation of this contract.
On January 5,1951, the contracting officer replied that the Government-furnished property had not been sent because plaintiff had indicated that he would not perform the contract unless the price were raised; further, unless assurance of plaintiff’s performance were received by January 15,1951, the contract would be terminated for default.
7. By letter of January 17,1951, plaintiff was notified that the contract was terminated for default and that the Government reserved its rights, including the right of repurchase. Plaintiff appealed the termination to the Armed Services Board of Contract Appeals (ASBCA).
On June 1, 1951, defendant entered into contracts for repurchase at a total price of $152,349.12. The successor contracting officer, on September 10,1951, submitted to plaintiff a claim for $66,121.60, based on the difference between the cost of repurchase and the contract price. Plaintiff appealed from this determination of excess costs; subsequently, the claim was amended to $29,670.07, an amount which, in the opinion of the contracting officer, represented the excess which would have resulted if repurchase had been made within a reasonable time.
On September 12, 1952, the ASBCA (1) sustained the termination of the contract for default, but (2)' rejected the assessment of excess costs since (a) the actual repurchase was made too late to afford a basis for recovery under the default clause and (b) the amended claim was not made pursuant to the contract.
CONTRACT TAP-1904
8. On April 22,1953, plaintiff submitted a bid under Invitation No. TAP-30-352-53-503 issued April 6,1953, for 361,- *118 200 OD barrack bags, and on May 26, 1958, defendant awarded a contract to plaintiff for the manufacture of 144,-600 barrack bags. Pursuant to tbe terms of that contract (TAP-1904), defendant made a shipment of Government-furnished material to plaintiff by Government bill of lading on June 17, 1953. At the time this second contract was awarded and the shipment of Government-furnished material made, plaintiff was confined to a hospital because of illness, and it was impossible for him to perform the contract. By supplemental agreement, Modification “1” dated August 5,1953, defendant’s contracting officer and the plaintiff agreed, in pertinent part, to the following:
Whereas, contractor has been awarded contract No. DA-30-352-TAP-1904 (OI-1962-E-53) dated 26 May 1953 for the manufacture of 144,600 Bags, Barrack, OD, at a unit price of $.385; and
Whereas, contractor is unable to continue the performance of subject contract; and
Whereas, it is in the best interests of the Government;
Now, THEREFORE, IT IS MUTUALLY AGREED BETWEEN THE PARTIES AS FOLLOWS :
1. That the contract be terminated as to the entire contract quantity without cost to the Government.
2. Although no repurchase is to be effected, the Government reserves all other rights pursuant to law and under the contract.
Defendant incurred the sum of $1,172.94 for freight charges paid by defendant in making shipment of Government-furnished material on June 17,1953, and cost of labor in returning the Government material to stock.
9. Plaintiff is now claiming entitlement to a monetary award of $12,840, in the broad moral nonjuridical sense, predicated upon general equitable considerations. On September 7,1950, the contracting officer reported to the Quartermaster General that it was his carefully considered opinion that, under all the facts and circumstances, the Government should allow the contractor to be relieved of his obligation under contract QM-3833.
Prior Law Suit
10. In its opinion dated January 18, 1961, in Josephine C. Rumley, Administratrix, etc. v. The United States, 152 Ct. *119 Cl. 166, the Court of Claims found that there was due and owing to the defendant $27,930 on its counterclaims against plaintiff based on contracts QM-3833.[21] Defendant requested judgment on its counterclaim only to the extent necessary to offset any judgment the plaintiff was entitled to recover under contract QM-12130. The court further found that, under the circumstances- involved, the defendant’s agreement to accept judgment in its favor in an amount necessary to offset plaintiff’s claim under contract QM-12130 was reasonable and would result in substantial justice to both parties. The court concluded that plaintiff was entitled to recover $12,840 from the United States, and that the United States was entitled to recover a like sum from the plaintiff.
11. The record in this second claim is the same as the record in the case of Josephine C. Rumley, Administratrix, etc., cited above, with the exception of three additional exhibits-: Plaintiff’s exhibit 13 , which is a copy of contract TAP-1904; plaintiff1’s exhibit 14, which is a letter dated January 20,1954, addressed to plaintiff; and defendant’s exhibit 45, which is a certificate of no record. No additional testimony or other evidence has been introduced.

 Authority for the reference is found in 28 U.S.C. § § 1492, 2509. H. Res. 249 related to a bill, H.R. 6012, 87th Cong., 1st Sess., for the relief of plaintiff. See finding 3, infra.

 The petition in this ease was filed prior to the opinions of the Supreme Court in Glidden Co. v. Zdanok, 370 U.S. 530 (1962). The testimony tafcen in the preceding case (Rumley v. United States, 152 Ct. Cl. 166, 285 F. 2d 773 (1961)) was incorporated in the record of this case. See finding 11, infra. It is, therefore, deemed proper to file this report with the Congress without reference to the opinions in Glidden Co. v. Zdanok, supra.

 As indicated by the title, the present case was instituted by Josephine C. Rumley, the administratrix of the estate of George S. Rumley. In the prior action (152 Ct. Cl. 166), Josephine C. Rumley, administratrix, was substituted as plaintiff on November 9, 1960. Mr. Rumley did business as the George S. Rumley Shoe Mfg. Co.

 The price of 54 cents, with one exception, still would have been lower than any of the other bids. The exception was the bid of E. A. Brown Manufacturing Company, whose price for delivery to one location (Fort Worth, Texas) was $0.4688. However, when the cost of transporting Government-furnished property to Brown was considered, the latter company’s bid was not lower than plaintiff’s original bid.

 See finding 5, infra.

 See finding 5, infra (paragraph 15 of the contracting officer’s report).

 See finding 6, infra.

 See finding 7, infra.

 This court found, in its former decision, that the Government had lost its right under contract QM — 3833 to recover excess costs, but that the defendant could receive damages for breach under the common law, based upon the reasonable costs of repurchase, in the amount of $27,930. 152 Ct. Cl. 166, 171-72.

 In the prior suit, 152 Ct. Cl. 166, 189, with regard to defendant’s counterclaim based on TAP-1904, the only amount referred to was $1,143.19. In the instant case, a new item of evidence (offered by plaintiff) was defendant’s letter of _ January 20, 1954; this letter stated that the amount due from plaintiff on account of TAP-1904 was $1,172.94.

 See footnote 1, 152 Ct. Cl. 166, 167.

 In the instant case, plaintiff asserts that it would be unreasonable to hold him liable for the counterclaim.

 The lowest bids, other than those of plaintiff and E. A. Brown Manufacturing Company (see footnote 4, supra), were Dumas Co., whose average bid, for all locations, was $0,563X4, and the Camel Co., whose bid was $0.5877.
“There were 61 bids submitted, of which three entered no price. All other bids [i.eother than the bids of plaintiff, Brown, Dumas, and Camel] were at the unit price of 60 cents or above. Considering variations in prices for different points of delivery, all other bidders would fall into the approximate groups as follows: Six in the 60 to 70 cents price, four in the 70 to 80 cents price, live in the 80 to 90 cents price, thirteen in the 90 cents to $1 price, eleven in the $1 to $1.25 price, four in the $1.25 to $1.50 price, five in the $1.50 to $2 price, and six bids were over $2 per unit.” Finding 7, 152 Ct. Cl. 166, 179-80.

 152 Ct. Cl. 166, 170.

 Part of plaintiff’s letter is quoted in finding 6, infra.

 Regarding this question, defendant also cited the following cases: Blabon v. United States, 146 Ct. Cl. 13, 173 F. Supp. 799 (1959) ; Tentsch v. United States, 153 Ct. Cl. 86, 288 F. 2d 920 (1961) ; Galen H. Clark Packing Company v. United States, 158 Ct. Cl. 93 (1962).

 In this regard, cf. Creek Nation v. United States, 168 Ct. Cl. 483 (1964).

 Plaintiff now contends that he is not liable for the “excess costs” because of the provision in the default article that “The Contractor shall not be liable for any excess costs if any failure to perform * * * arises out of causes beyond the control and without the fault * * * of the Contractor. * * *” In answer to this assertion, it is sufficient to point out that contract TAP — 1904 was terminated by agreement of the parties, not pursuant to the default clause.

 This amount represents the $12,840 claimed on the basis of contract QM-12130, less the $1,172.94 due the defendant under contract TAP-1904.

 In George S. Rumley, d.b.a. George S. Rumley Shoe Mfg. Co. v. The United States, No. 286-56, there was duly filed a motion to substitute Josephine C. Rumley, adminstratrix of the estate' of George S. Rumley, deceased, as plaintiff. On November 9, 1960, the court allowed the substitution of Josephine C. Rumley, administratrix of the estate of George S. Rumley, as plaintiff.

 Regarding the counterclaim based upon contract TAP-1901, plaintiff had admitted liability.